[No. 10787. Department Two. July 29, 1913.]

P. C. RICHARDSON, *Respondent*, v. SARAH C. SEARS *et al.*, *Appellants.*[1]

CONTRACTS—PERFORMANCE OR BREACH—FORFEITURE—WAIVER. The right to forfeit a contract whereby plaintiff was to clear land by May 1st, 1905, receiving a specified portion of the land as pay for his services, is waived where the owners acquiesced in delay and encouraged the continuance of the work until November 1908, when the work was practically finished and the land had greatly increased in value, at all times allowing plaintiff and persons advancing money to him for the work to understand that the contract was still in force.

CONTRACTS—MEDIUM OF PAYMENT—CONSTRUCTION. A contract for the clearing of land providing that the contractor is to be compensated at the rate of $125 per acre by having conveyed to him a portion of the land at the valuation of $700 per acre, does not leave it optional with the owners to pay either in money or land; especially where further provisions gave the owners a lien on the contractor's portion of the land for rent falling due, and prevented him from erecting structures thereon which would be nuisances in the neighborhood.

CONTRACTS—CONSTRUCTION. A contract agreeing to convey specified portions of a tract of land in consideration of clearing the

[1]Reported in 133 Pac. 1010.

tract does not entitle the contractor to "shore lands" in front of his portion of the tract.

SPECIFIC PERFORMANCE—DEFENSES—DELAY—EFFECT.  Specific performance of a contract to convey land in consideration of services rendered will not be defeated by long delay in completing performance, during which time the land had greatly increased in value, where the contractor prosecuted the work in good faith and the owners acquiesced in the delay and urged completion of the work, and the owners were in no way prejudiced.

Appeal from a judgment of the superior court for King county, Tallman, J., entered April 6, 1912, upon findings in favor of the plaintiff, in an action for equitable relief.  Modified.

*Peters & Powell*, for appellants.

*Charles P. Spooner*, for respondent.

MAIN, J.—This action was brought for the purpose of compelling a conveyance of real estate.  On May 1, 1903, and for some time prior thereto, Joshua M. Sears and Sarah C. Sears, his wife, of Boston, Massachusetts, were and had been the owners in fee of a tract of land containing approximately 106 acres, in sections 23 and 26, Twp. 24 N., R. 4 E., W. M., lying about six miles south of the center of the city of Seattle, in King county, Washington, on the western shore of Lake Washington, near what is known as Brighton Beach.  On June 5, 1905, Joshua M. Sears died. By the provisions of his last will and testament, the estate was to be managed by certain trustees, residing at or near the city of Boston, Mass.  On March 16, 1906, the will was admitted to probate in the superior court of King county, this state, and W. A. Peters was appointed administrator with the will annexed for that portion of the estate which was then within the state of Washington.

By written contract, dated April 13, 1904, Sears and wife leased the lands above described to the plaintiff, for a term extending to the first day of May, 1909.  The rent reserved was $250 per annum from date until March 1, 1905, pay-

able quarterly, and at the rate of $925 per annum from the latter date until the end of the term, payable in like manner. The contract provided that the plaintiff was to immediately commence work upon certain described portions of said lands, amounting to about 90 acres, and in a specified manner clear and seed the same. The work was to be diligently prosecuted and completed on or before May 1, 1905. The contract was entire. It provided that the plaintiff "shall not be deemed to have earned any of his compensation until he has wholly or substantially completed the improvement as above contemplated." The provision of the contract with reference to the compensation that the plaintiff should receive for doing the work is as follows:

"As payment for which the party of the second part (Richardson) is to be compensated at the rate of $125 per acre for the lands so improved being ninety (90) acres more or less, exclusive of the land to be conveyed to Richardson as herein provided; payment to be made when said work is fully completed to the satisfaction of the parties of the first part, by the conveyance to said second party, his heirs, executors, administrators or assigns of a portion of the above described tract of land at a valuation of $700 per acre, said land to be taken from the following described tracts:"

Then follows a particular description of the tracts mentioned in the contract as tract "A" and tract "B," comprising about 16 acres, and as the contract states, "said tracts together to make up the acreage so to be earned by the said party of the second part." The contract contained other provisions ordinarily contained in leases which need not here be referred to.

Immediately after the execution of the contract, the plaintiff, being then in possession of the land, commenced the work of clearing. On May 1, 1905, that being the time specified in the contract, the work was not completed. The plaintiff, however, represented to the administrator that he could finish a portion of it by the fall of 1905 and the remainder in the spring of 1906. During the year 1905, representatives of

the trustees were in Seattle and went over the land and were informed by the administrator of the status of affairs. The administrator represented to them that the plaintiff was doing the best he could. Nothing was done towards interfering with the plaintiff in the progress of the work, and the matter drifted along until the spring of 1906. In March of that year it appears that, owing to the fact that the plaintiff had been disappointed in not receiving a substantial sum of money which he had expected, and owing to the further fact that the work was much more difficult to perform than had been anticipated, only about one-half of the clearing had been accomplished. No part of the rent due up to that time had been paid.

At this time, the plaintiff tendered to the administrator a check for the sum of $1,335, being the amount of the rent then due, and requested that the trustees accept an assignment of the lease from the plaintiff to one Everett Smith, who was furnishing the plaintiff money to pay the rent and was undertaking to finance the proposition for the plaintiff to the completion; the plaintiff stating that the work would be fully completed by the fall of 1906. The administrator refused to accept the rent, stating that the plaintiff was in default and that he had no authority to make any waivers or changes in the contract. He stated, however, that he would submit the matter to the trustees, recommending that the plaintiff's request be complied with. The administrator forwarded the papers to the trustees with his recommendation that they be executed. On June 4, 1906, the extension agreement, properly executed, was mailed by the trustees from Boston to the administrator at Seattle. Before its receipt, the administrator had received an offer of purchase of the lands in question at the price of $100,000, for the 106 acres. On June 6, 1906, the administrator by letter communicated this offer to the trustees. He also referred to the extension agreement advising that it would probably be well to execute it if the trustees decided not to sell the property until some

later date. The fair market value of the property at the date of the execution of the contract was probably less than $700 an acre, the amount at which plaintiff agreed to take it in payment for the work. In 1906 the values had doubled, and in 1909 a further material increase had taken place.

On October 27, 1906, the administrator again wrote the trustees concerning reinstating the plaintiff, and on November 22, 1906, the trustees wired and wrote the administrator inquiring whether he had received the extension agreement that they had mailed on June 4. It is evident from these communications and from the statements contained in the trustees' letter of October 13, that the trustees understood that the extension agreement had been delivered. On November 22, the administrator wired and wrote the trustees that the papers had been received and in his letter stated that they had never been delivered owing to the unexpected increase in the value of the property, and owing to the fact that he was awaiting the trustees' conclusion as to whether they were going to sell or hold the property. On November 30 the trustees acknowledged receipt of the administrator's letter of the 22d. This appears to be the last correspondence touching the delivery of the papers.

The extension agreement was never delivered. The work had not been completed in the fall of 1906 as had been anticipated. The plaintiff continued in possession, and in good faith and with all the means at his command prosecuted the work. The administrator at all times, from the commencement of the work until the same was nearly completed, urged the plaintiff to continue and to complete it as speedily as possible, believing, however, as he testified, that the contract had been forfeited, but that at the completion of the work the trustees would make a fair settlement and compensation for the work done. During the progress of the work, at different times, the plaintiff made proposals whereby he sought to secure a conveyance of a portion of the land he was to receive in order that he might encumber the same

for the purpose of raising money to meet his obligations and to prosecute the work. None of these proposals met with the approval of the administrator. During the progress of the work, the plaintiff incurred debts which he was unable to pay, and liens were filed and a judgment entered against the property thereon, amounting in all, including interest, to $1,866.96, which the trustees were required to pay in order to avoid foreclosure. It appears that the plaintiff in doing the work incurred an indebtedness of something over $18,000, not including his rent, of which sum over $13,000 was borrowed money.

During the time the work was in progress, the administrator visited the place several times and looked over the work. He and the plaintiff went over the ground together in the month of September, 1908. The administrator then had with him the contract and referred to it in ascertaining whether the work was being done in accordance with its terms. The work was then practically all completed except the plowing and seeding. Reference was made to some work that had not been done on tract "B," but the plaintiff stated that he was not required to clear that tract, as it came to him, to which assent was made. After looking over the ground, the administrator designated certain work in addition to the plowing and seeding which should be done in order to complete it to his satisfaction. Thereafter this work was performed and the administrator was notified. On October 24, 1908, the plaintiff notified the administrator that the plowing and seeding were then being done.

On November 7, 1908, the administrator gave plaintiff written notice that any work he did was at his own risk. This was the first and only formal and written notice from the administrator or the trustees that they did not expect to be bound by the terms of the contract in settling for the work. It is evident from the communications passing from the plaintiff to the administrator that he at all times considered the contract in force, and that settlement would be

made according to its terms by conveying to him tracts
"A" and "B." On March 17, 1909, the plaintiff finished
the work according to the terms of the contract. Settlement
therefor not being made, in November, 1909, the present
action was begun seeking to compel a conveyance of tracts
"A" and "B" and the shore lands in front of tract "A." The
cause was tried to the court without a jury. The court
found in favor of the plaintiff, and on April 6, 1912, entered
a decree requiring the defendants to convey to the plaintiff
tracts "A" and "B," and the shore lands in front of tract
"A," upon payment by the plaintiff to the defendants of cer-
tain sums due for rent, liens, taxes and shore lands, and
giving the plaintiff ninety days after the entry of the de-
cree, or in case of an appeal, ninety days after the filing of
the remittitur in the superior court, to pay these sums.
From this judgment, the defendants have appealed.

The questions which are chiefly material upon this appeal
are: (1) had the rights of Richardson under the contract
been forfeited; (2) did the appellants have the option to
pay either in money or land; (3) did the trial court err in
decreeing that the shore lands in front of tract "A" be con-
veyed; and (4) did the conditions and values so change dur-
ing the delay as to render specific performance inequitable?

I. It is contended by the appellants that, because of
the fact that the land was not cleared within the specified
time, his right to claim compensation under the provisions
of the contract had been forfeited. It is true that the ad-
ministrator from time to time stated to Richardson that he
was in default. It is also true that the administrator re-
fused to accept the tendered payment of rent after the ex-
piration of the period in which the clearing of the land was
to have been completed. On the other hand, it is apparent
that Richardson and those assisting him by way of advance-
ments understood that, if the land were cleared, compensation
would be made therefor as specified in the contract. The
evidence makes it plain that the continuance of the work

was with the acquiescence and approval of those managing the Sears' estate. By the terms of the contract, the rent was to be $250 for the first year, payable in quarterly installments, and $925 thereafter, payable in like installments. The increased rental is not made to depend upon the question whether the land had been cleared at the time it was specified to begin. In order to have terminated the lease, it would have been necessary to serve written notice to pay rent or vacate the premises, as required by the statute. This was not done. Whether the appellants had the right to claim a forfeiture of that portion of the contract providing for the clearing, when the same had not been completed within the time specified, without forfeiting the lease, is a question we need not determine. Considering only that portion of the contract pertaining to the clearing, under all the facts and circumstances there was not a legal forfeiture. The indulgences extended to Richardson were such as to waive the right to a forfeiture. In *Douglas v. Hanbury*, 56 Wash. 63, 104 Pac. 1110, 134 Am. St. 1096, it is said:

"But the rule is equally well established that the right of forfeiture must be clearly and unequivocally proved, and that the right may be waived by extending the time for payment, or by indulgences granted to the purchaser."

II. On the question of the right to pay in money or land, it is contended that the contract is optional. In other words, that the Sears' estate may elect whether it will convey the land specified in the contract or make the compensation in money at the price named per acre. The general rule is that where the contract provides for payment in either one of two mediums, the debtor may elect within the time specified as to which he will make payment in. In 30 Cyc. 1219, the rule is stated thus:

"Where the contract provides for payment in either of two or more mediums, a debtor may elect to make either mode of payment at the time fixed therefor. But where a debtor has the election, either to pay in a particular kind of money, or

in money or some other way, the right of election does not exist after the day when the payment becomes due, and if the promise is to pay in property or money the creditor is thereafter entitled to payment in money."

In the present case, however, this general rule does not apply. The excerpt from the contract above quoted makes it obvious that the payment was not to be made either in money or lands, at the option of the Sears' estate, but that the contract was to be performed by the conveyance of the tracts specified. The language in effect is that Richardson is to be compensated at the rate of $125 per acre for the land improved by having conveyed to him a portion of the land at the valuation of $700 per acre. That the parties did not intend the contract to be an optional one is manifest, not only from the language used in the excerpt quoted, but from other provisions of the contract. It is provided therein that, as security for the prompt payment of the rent and the fulfillment of other covenants and conditions of the lease by Richardson, "said lessors shall have a first lien by way of mortgage upon the lands to be hereafter set apart and conveyed to the lessees as compensation for the clearing and improvement hereinbefore provided." And also another covenant which provides "that the party of the second part (Richardson) neither as lessee nor as proprietor of the lands to be earned by him, will erect or permit to be erected upon said premises any structures . . . which shall be a nuisance to the neighborhood . . ." The language used in the excerpt first above quoted, together with the other covenants to which reference has been made, makes it manifest that the intention of the parties was that the contract was to be performed by the conveyance of land, and was not intended to be in the alternative. In construing such contracts, the intention of the parties is to be ascertained, and when so ascertained, given effect. In 3 Parsons, Contracts (9th ed.), p. 240, it is said:

"The true question is, whether it was intended that the promisor might elect to pay the money or deliver the articles; or, in other words, whether it was agreed only that he owed so much money and might pay it either in cash or goods as he saw fit. There might be something in the form of the promise, in the *res gestae* or in the circumstances of the case, which, by showing the intention of the parties, would decide the general question; but, in the absence of such a guide, and supposing the question to be presented merely on the note itself, as above stated, we should say that the more reasonable construction would be, that it was an agreement for the delivery of goods in such a quantity as named, and of such a quality as that price then indicated. And on a breach of this contract, the promisor should be held to pay, as damages, the value of so much of such goods, at their increased or diminished price."

The appellants, in support of their position that the contract is in the alternative, cite numerous authorities. From an examination of these, it appears that they are distinguishable from the present case, and that, with one exception, they fall within one of three classes: (1) Where the contract by its terms was in the alternative; (2) where no medium of value or exchange was expressed; and (3) where the contract was in the alternative and the debtor did not tender the property called for by the contract within the time specified and that therefore the creditor might elect to have it paid in money. The one authority cited which does not fall within any of these classes is the case of *Cock v. Blalock*, 1 Wash. Ter. 560. In that case the promise was to pay $250 United States gold coin to be paid in good merchantable wheat at fifty cents per bushel. The court there, without giving reasons or citing authority, held that the contract was in the alternative, evidently being of the opinion that such construction gave effect to the intent of the parties. In deciding the present case, it is not necessary, however, for us to either overrule or follow that case, for the reason that the contract we are now considering makes it plainly obvious that it was

not the intention of the parties that it should be in the alternative.

III. By the decree of the trial court, the appellants were directed to convey, in addition to the lands described in the contract, the shore lands in front of tract "A." This was error. The rights of the parties must be determined from the terms of the contract. There is nothing in the contract that justifies the inference that the parties thereto contemplated that it should cover shore lands.

IV. It is finally argued that, owing to the long delay in the completion of the clearing and the increase in the value of the property, it would be inequitable to decree a specific performance. But this position is not well founded. Richardson at all times prosecuted the work in good faith, and with such means as were available. The appellants not only acquiesced in the delay, but urged the completion of the work. The delay caused no substantial prejudice. The value of the property had greatly increased. But this alone is not sufficient to justify a denial of specific performance.

The cause will be remanded with direction to the superior court to modify the judgment as to the shore lands in accordance with the views herein expressed. The appellants will recover costs in this court.

ELLIS, FULLERTON, and MORRIS, JJ., concur.