[No. 36023. Department Two. February 21, 1962.]

RUSSELL W. LONGENECKER *et al., Respondents,* v. GENE BROMMER *et al., Appellants.*\*

\* Reported in 368 P. (2d) 900.

*Boynton Kamb*, for appellants.

*Edward W. Dolch* and *James M. Ballard*, for respondents.

OTT, J.—In 1955, Summit Timber Company entered into an agreement with Gene Brommer, doing business as Brommer Logging Company, to log and deliver an estimated thirty million board feet of timber, from an area described as the Sulphur Creek timber sale. The terms and conditions of the agreement were incorporated in a letter dated November 25, 1955, signed and approved by both parties, as follows:

"An oral agreement has been made with you to log the Sulphur Creek timber sale. The following paragraphs detail this agreement.

"You are to log the Wanlick Creek part of this timber sale for $36.25 per thousand. This is itemized as follows:

| | |
|---|---:|
| Falling and bucking | $ 4.25 |
| Yarding and loading | 7.00 |
| Cold-decking or spur roads | 2.25 |
| Fire trails and fire protection | .50 |
| Trucking | 13.25 |
| Road construction | 6.00 |
| Profit | 3.00 |
| | $36.25 |

"Summit Timber Company will furnish the culvert pipe needed for the road construction in this area. The tem-

porary bridge over Rocky Creek is to be constructed by you at your cost.

"You will pick up the right-of-way logs from the Sulphur Creek Bridge No. 2 to Rocky Creek, and log that portion of Unit No. 11 north of Rocky Creek for $23.75 per thousand.

"You will also log the timber on the Schriber Meadows Road, Units No. 4 to 10 inclusive, but will not build road unless other arrangements are made with Ed Steen. For this part of the logging of the Sulphur Creek Sale you will receive $30.25 detailed as follows:

| | |
|---|---:|
| Falling and bucking | $ 4.25 |
| Yarding and loading | 7.00 |
| Cold-decking or spur roads | 2.25 |
| Fire trails and fire protection | .50 |
| Trucking | 13.25 |
| Profit | 3.00 |
| | $30.25 |

"Road maintenance has not been set up in the contract as the exact disposition of this item cannot be determined now. Should you take over the maintenance then you will be allowed 50¢ per thousand additional on your contracts. A rental fee on the radio will be determined.

"Truck scale tickets are to be sent to us at the end of each week. Advances as needed shall be based on seventy-five per cent of truck scale tickets received.

"You are contracting to buy:

| | |
|---|---:|
| Shovel loader | $27,500.00 |
| Dump truck | 2,000.00 |
| Fire truck | 2,000.00 |
| Arch | 2,500.00 |
| Pickup | 1,800.00 |
| | $35,800.00 |

"Also guy lines and blocks at a price to be determined. A sum of $1.50 per thousand will be withheld to pay for the above equipment. All volumes on which final payments are to be made to you are to be based on scale bills of the Puget Sound Log Scaling and Grading Bureau.

"All logs are to be delivered to Summit Timber Company at Mitchell's Log Dump at Anacortes or such other dump as Summit Timber Company may direct. Any increase or decrease in log hauling rates that may result from such

change shall affect the contract by the same increase or decrease.

"Summit Timber Company shall not be required to pay for any wood logs or cull logs included in the logs delivered.

"The Sulphur Creek timber sale agreement is a part of this contract and you agree to complete the performance of this agreement according to all of its terms and conditions inasmuch as it applies to you in the cutting and removal of logs, fire trails, fire protection and slash disposal, road building and any other clauses pertinent to the removal of timber other than permanent bridge construction, stumpage payments and reappraisals.

"If under any circumstances you should not be able to complete this contract now being made then Summit Timber Company shall have the right to secure another contractor to remove the remainder of the timber.

"If the above is as you understand the oral agreement and if you have no changes to be made in this agreement, will you sign in the space provided below and return the copy of this letter to us."

April 1, 1956, Gene Brommer entered into the following written contract with Russell Longenecker and Raymond Ashe, doing business as L. A. Log Company, to do the falling and bucking part of the Summit contract:

"AGREEMENT Between Gene Brommer, logging contractor, and Raymond Ashe and Russell Longenecker, partners, and known as L. A. Log Co., fallers and buckers.

"It is agreed that L. A. Log Co. will fall and buck all the timber to be logged by Mr. Gene Brommer, under contract with Summit Timber Co., known as the Sulphur Creek sale comprising approximately thirty million board feet.

"Mr. Brommer will designate the areas in which to fall and buck said timber.

"The L. A. Log Co. to fall and buck said timber in a competent manner as prescribed by the National Forest Regulations, to assume all labor and material costs, including all payroll costs, for said falling and bucking.

"It is agreed that the rate to be paid be $4.00 per thousand board feet and the board feet will be compiled from scale bills of the Puget Sound Log Scaling Bureau (commonly known as water scale), and one copy of each scale bill to be furnished L. A. Log Co.

"Paydays will be on the 10th and 25th of each month at which time 75% of the truck scale will be used to determine the amount of paychecks, at $4.00 per thousand board feet."

L. A. Log Company carried on the falling and bucking operations in the years 1956 and 1957. At the beginning of the 1958 logging season, L. A. Log Company was advised by Brommer that it would not be permitted to continue falling and bucking because he could "do it cheaper himself." Brommer thereafter contracted with Kenneth Sullivan to do the falling and bucking under his Summit Timber Company contract.

June 26, 1958, L. A. Log Company commenced this action against Brommer for $32,000 damages for wrongfully repudiating the falling and bucking contract. The defendant's amended answer denied liability and affirmatively alleged that plaintiff had breached the contract by failing to comply with the Forest Service regulations, and that the falling and bucking were not done in a competent manner.

The cause was tried to the court. From a judgment for the plaintiff in the sum of $7,280, the defendant has appealed.

Appellant asserts that the respondent breached the contract by violating the Forest Service regulations and that, therefore, the court erred in refusing to dismiss the case at the close of respondent's proof. The court found that respondent did so breach the contract, but also found that the evidence established that appellant had waived his right to rescind. Findings of fact Nos. 11, 12, and 13 are as follows:

"(11) That the Defendant Gene Brommer did not attempt to rescind or cancel, at that time, his contract with the Plaintiffs for breach of contract, and the said Defendant continued to use the services of the Plaintiffs under written contract to the second week of December 1957. The Defendant Gene Brommer accepted the timber as felled and bucked by the Plaintiffs, and continued to ship the same to Summit in fulfillment of his contract with it and to receive financial remuneration therefor, and during the remainder of the logging season that year had no further complaint of any kind from any source and made no com-

plaint to the Plaintiffs, and that there were no violations by the Plaintiffs which he could or did complain.

" (12) In the month of February 1958, at about the time the Plaintiffs and Defendant Gene Brommer were ready to commence work for the new season under the contract, the Plaintiffs had heard rumors that they were going to be replaced by the Defendant Gene Brommer. The Plaintiffs asked the Defendant about these rumors and were told that he intended to secure the services of another because he could get the falling and bucking done cheaper. On that occasion Defendant made no complaint to the Plaintiffs relative to the manner or character of their work, nor was anything said by the Defendant about rescission or cancellation of their contract for any past breaches or failures by the Plaintiff. On a later date, however, the Defendant advised the Plaintiffs that he was hiring another to do the job because of Plaintiffs' poor management in payment of help.

"There was no evidence that the Plaintiffs had violated the contract in that manner and there was no proof of such violation, and the Court finds that this statement of Defendant Gene Brommer was an excuse by him to justify his actions and was based on nonexistent facts.

" (13) The Court further finds that Defendant Gene Brommer attempted no act of rescission or cancellation of the contract with Plaintiffs for failure to comply with the National Forest Service Regulations until after the Plaintiffs herein filed this suit for breach of contract."

The court found that, with full knowledge of the breach, the appellant continued to accept the benefit of respondent's performance and did not assert the breach as a ground for rescission of the contract until this action was instituted. Such conduct constituted a waiver of the right of rescission. See 5 Williston on Contracts (3d ed.) §§ 680, 684, 687, 688; 3 Black on Rescission and Cancellation (2d ed.) §§ 590, 605; 1 Restatement, Contracts § 309. See, also, *Richardson v. Sears,* 74 Wash. 499, 133 Pac. 1010 (1913); *Fry v. Grangers' Warehouse Co. of Enumclaw,* 131 Wash. 497, 230 Pac. 423 (1924); *Masters v. Hultin,* 158 Wash. 204, 290 Pac. 690 (1930).

Based upon the court's factual determinations and the law applicable thereto, the court did not err in refusing

to dismiss the action at the close of respondent's evidence. Appellant next contends that

"The trial court erred in determination of damages allowed to Plaintiff by failing to charge against Plaintiff's profits *all* costs of falling and bucking during the years 1958 and 1959."

In determining the respondent's measure of damages, the trial court used as its basis the profit of Sullivan's operations. In this regard, the court said:

"In the final analysis, the cost of Sullivan's operation for 1958 and 1959 attributable solely to falling and bucking the 12,888,800 board feet of timber (exclusive of culls) was $32,345 or $2.51 per thousand. His profit, based upon a gross income of $4 per thousand, would have been $1.49 per thousand for the falling and bucking of 12,888,800 board feet of merchantable timber. The net profit was $19,203.

"Plaintiffs were deprived of income in the amount of $19,203 by the Defendant's breach of contract; however, during the same period of time Plaintiffs had obtained other employment in mitigation of their damages. It is agreed that they earned $11,923. This must be deducted from the total income of $19,203 for damages in the amount of $7,280.

"Plaintiffs are entitled to recover from Defendant $7,280."

█ When one contracts to perform work for another and is prevented by him from performance, the measure of damages is the difference between the cost of performing the work by the party agreeing to do it, and the price agreed to be paid for it. *Watson v. Gray's Harbor Brick Co.,* 3 Wash. 283, 28 Pac. 527 (1891); *Beeson Bros. v. Chambers,* 155 Wash. 564, 572, 285 Pac. 433 (1930), and cases cited. See, also, *Donald W. Lyle, Inc. v. Heidner & Co.,* 45 Wn. (2d) 806, 278 P. (2d) 650 (1954). The court committed reversible error when it used the gross income of Sullivan's operation and deducted therefrom Sullivan's cost in order to arrive at L. A. Log Company's damages.

During the trial, respondent's evidence established that in July, 1956, Brommer and L. A. Log Company entered into an oral agreement wherein Brommer agreed to pay respondent $4 per thousand board feet for falling and

bucking such pulp or cull logs as he could dispose of profitably. Brommer found such a market and paid respondent for falling and bucking such logs in the years 1956 and 1957, except that the price was reduced, by mutual agreement, to $3 per thousand in May, 1957.

Appellant contended at the trial and on appeal that the extra payment for the cull or pulp logs was a gratuity on his part; that the respondent was obligated to fall all trees 12 inches in diameter and 15 feet tall and, by the terms of the contract, was to be paid therefor at the rate of $4 per thousand board feet for the timber delivered to Summit, and that the pulp logs were to be left in the forest.

The trial court did not find that appellant's contention in regard to a gratuity payment was established, for it deducted the percentage cost of falling and bucking the cull or pulp logs and allowed judgment against appellant accordingly.

■ We agree with the trial court's conclusion that Brommer's payment for falling and bucking the pulp logs was not a gratuity, but was based upon a valid consideration flowing to both parties. The consideration to respondent for the extra work involved was $4 and $3 per thousand board feet. One consideration flowing to the appellant was that he was obligated to fall and buck the trees, by virtue of his contract with Summit, at an estimated cost of $4.25 per thousand board feet, and that respondent performed this part of the obligation at a cost to Brommer of $4. Brommer's contract with Summit provided that Summit did not want pulp logs delivered to its dumps, and that "Summit Timber Company shall not be required to pay for any wood logs or cull logs included in the logs delivered." There was nothing in the Summit contract which would prevent Brommer from selling the merchantable pulp logs to a pulp company, provided proper arrangements were made for stumpage. That such an arrangement was made is clear from the testimony of Ken Walin, for the reason that the pulp logs were removed from Summit's property with its full knowledge and consent. Further, neither respondent

nor appellant knew, at the time the written contract was executed, that the percentage of pulp logs would increase from 8 per cent of total production in 1956 to 42 per cent of total production in 1957, 36 per cent in 1958, and 31 per cent in 1959, or that the pulp logs could be profitably marketed.

Brommer, in his testimony, admitted that, although all required timber had to be cut, the bucking of the pulp logs for delivery required extra work on the part of the respondent, and that he could pay $4 per thousand for this work and still "we could come out on them, which we did." That Brommer's profit on the pulp was substantial is evidenced by his further testimony that, when the price· of pulp logs fell $4 per thousand board feet, he required the fallers and buckers to absorb only $1 per thousand, and the price paid respondent was then reduced to $3. That the payment was not a gratuity is further evidenced by the fact that, for a considerable period during 1957, no deliveries were made to Summit, and Brommer's entire operation was being sustained by the falling and bucking of pulp alone. It is clear that the bucking of pulp logs for mill delivery was not required of respondent by the written contract, and that the payment to respondent for such service was, therefore, not a gratuity.

Objection was made to the evidence of the oral agreement relative to the pulp logs, upon the ground that it was not within the pleadings. The objection was overruled. Thereafter, without objection, the following evidence was introduced:

(Direct examination of Russell W. Longenecker) "Q. Will you explain to the Court whether or not Mr. Brommer followed his portion of the contract in 1957. A. In 1957 he paid us for all the timber we cut except that in May he reduced us by one dollar a thousand on the pulp we cut. Instead of getting four dollars for pulp we took three dollars for pulp. Q. Will you explain this, please, the circumstances? A. Well, at the time we were not allowed to ship any logs so that we were cutting in a part pulp. That is all they could haul out of there. The price of pulp dropped and in order for him to keep on operating he had

to take a cut of one dollar a thousand, which left us three dollars a thousand."

(Cross-examination of Russell W. Longenecker) "Q. When you first started out in your operation were you paid for any culls that were left in the woods? A. No. . . . Q. When he went back, when Mr. Brommer went back in at this later day and hauled out the culls were you ever then paid $4 a thousand on the culls when he hauled them out? A. Yes. Q. Do you recall having any conversation with Mr. Brommer during approximately June or July of 1956 with reference to the fact that he was able to find a market and dispose of this cull timber? A. Yes. Q. Do you remember at that time that there was discussed with you that for all of this cull timber that he could dispose of and sell that you would be paid for your falling and bucking on the same basis as you were operating under the contract? A. He agreed to pay us $4 a thousand for the culls we cut, yes, for the culls we cut. Q. That understanding was had after you had been in operation on your first contract and you had been operating for several months, was it not? A. Yes. Q. In your testimony you did testify that, first, there was no change in the falling and bucking contract that you had with Mr. Brommer, that stayed the same. A. Yes. Q. Your testimony also was that sometime in the fall of 1956, I believe, that Mr. Brommer came to you and talked to you about reducing the price you were to be paid for culls from $4 to $3; do you remember that? A. Not in the fall of '56, no. Q. When was that? A. That was 'long about in May of '57. Q. Now, this deal with reducing the price of these culls was something that was separate and apart from your regular falling and bucking, was it not? A. Because we were at that time cutting nothing but pulp for him. We were not to cut green timber. We were cutting nothing but pulp. Q. And for that you were getting $3 a thousand? A. Yes, we had been getting $4 up to that time and we got 3 from then on. . . . Q. And then commencing in about the middle part of 1956 you then began getting paid on the culls as they were hauled out and otherwise disposed of by Mr. Brommer. A. That is right. Q. And did that sort of double-arrangement then continue as long as you were working for him? A. Yes, up until the time of the $3 cut, but we spent, my partner and I spent about six weeks in the spring of 1957 cutting nothing but pulp. We didn't cut more good merchantable timber at all. Q. Was that the period of time that I think you referred to, but I am not sure,—during that period of

time, then, you were not operating under this contract here in suit, were you? A. We were cutting in the Sulphur Creek Sale. Q. But were you cutting in performance of this contract or were you cutting on a separate arrangement with Mr. Brommer for this pulp? A. He called us up to go to work, to cut, and cut nothing but pulp, try to cut nothing but pulp. We also got some good saw logs at the same time."

With reference to the agreement to pay for the culls or pulp logs, Brommer testified on direct examination as follows:

"Q. Then you started to say in June or July something else happened; what was that? A. I had heard about these pulp logs, and I was going to try a few loads to Weyerhaeuser in Everett, sell them a few loads and see if we could come out on them, *which we did*. And L. A. Logging Company were having a hard time making it with so much cull material growing or such a percentage of rotten trees with good timber that, after we tried these pulp logs, I told them that I would give them $4 a thousand more for the pulp and we would continue sending it, to help them out so that they could have a little profit off of their cutting. Q. Was there any more work required in preparing the cull or pulp logs, as you used it, that were left in the woods when they were brought out and sold? A. I can't say there is much more work to be done to them because when you fall most trees you don't know whether they are rotten or not, and you have to buck them into log lengths to find out whether there is any defect in the tree. Sometimes you have a defective butt on a tree and one log in the middle is sound and the top is rotten, or vice versa. You can have a rotten spot in the middle and both ends of the tree are sound, so that way you have got to buck the whole tree to find out where your merchantable logs are. . . . Q. Then could you state for how long that you paid them $4 a thousand for these culls? A. I paid them $4 up until around April or May in 1957, because the pulp market dropped $4 a thousand and they agreed to take a dollar cut, so that we could continue shipping it because merchantable logs weren't selling and all we could take out after that was pulp logs up until around September of that year in 1957. Q. During the time that they operated for you insofar as the merchantable logs were concerned, did you ever pay them any price other than $4 a thousand? A. Yes. Q. On the merchantable logs? A. No. Q. Did that remain constant

throughout? A. Yes. Q. So far as this deal with the culls or the pulp is concerned, did that have any relation to or was that any part of the falling and bucking contract dated April 1st, 1956? A. It had none whatsoever." (Italics ours.)

Ken Walin, logging engineer and forester for Summit Timber Company, testified as follows:

"A. In 1956 the culls that were removed from the timber sale area amounted to 809,640; in 1957, 1,956,680; in 1958 there were 2,976,580; and in 1959 there were 3,397,900. . . . Q. From these figures that you have given could you give a percentage of the difference between culls and sawlogs taken out for each of the years, for '56? A. In 1956 the culls amounted to 8 percent of the total product; in 1957 culls amounted to 42 percent of the total product; in 1958 culls amounted to 36 percent of the total product; and in 1959 culls amounted to 31 percent of the total product."

■ Appellant does not assign error to the evidence in the record relative to the oral agreement. Instead, appellant argues that it supports his contention of a gratuity.

Rule of Pleading, Practice and Procedure 15(b), RCW Vol. 0, provides in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." *Watkins v. Sweeney,* 52 Wn. (2d) 383, 325 P. (2d) 727 (1958); *Krenov v. West Coast Life Ins. Co.,* 48 Wn. (2d) 180, 292 P. (2d) 209 (1956). See 3 Moore's Federal Practice (2d ed.) 843, Rule 15(b). That the pleadings were deemed amended, by implied consent, to include the oral agreement is established, in that respondent contended that both parties benefited under the oral agreement which modified the original written contract, and appellant contended that the oral agreement was entirely a gratuity.

The trial court, in finding of fact No. 8, construed the issues resulting from the oral agreement as follows:

"The oral contract between Plaintiffs and Defendant with regard to the pulp or cull logs was separate and distinct from that evidenced by Plaintiffs' Exhibit No. 1. It was separate not only as to subject matter, basis of appli-

cation and method of payment, but also as to the time of entering into the same. The matter of damages under the separate oral contract is not presently before the Court for determination."

■ In finding of fact No. 14, the court declined to consider the pulpwood or culls as an element of damages arising from this transaction, and left that phase of the case to be adjudicated in a subsequent action. The court, having all of the interested parties before it, was duty bound to adjudicate the issues as raised by the amended pleadings. The pleadings, as amended, presented either a modification of the written agreement or a separate claim which increased or diminished the damages, if any, to which respondent was entitled. It is the established policy in this state that litigation between the same parties, arising out of the same transaction, be determined in one action to avoid multiplicity of suits. *Abbott Corp. Ltd. v. Warren,* 53 Wn. (2d) 399, 333 P. (2d) 932 (1959). The court erred in refusing to adjudicate the issues as raised by the amended pleadings.

The judgment is reversed, and the cause remanded with instructions to enter findings of fact and judgment upon the issues raised by the pleadings as amended or, in the alternative, to grant a new trial. Costs will abide the final determination of the cause.

HILL, DONWORTH, HUNTER, and HAMILTON, JJ., concur