[No. 2-39430-1.    Division One.    December 29, 1969.]
Panel 2

PRAGER'S, INC., *Respondent,* v. BULLITT COMPANY, *Appellant.*

576

*Riddell, Williams, Voorhees, Ivie & Bullitt* and *J. Vernon Williams*, for appellant.

*Monheimer, Schermer, Van Fredenberg & Smith, John M. Schermer, Melville Monheimer, Jr.,* and *Stephen P. Ryder,* for respondent.

STAFFORD, J.—This dispute involves a lease. Bullitt Company, the defendant-lessor, appeals from a decision that the lease was modified to eliminate a clause (hereinafter called the "recapture clause") which gave the lessor an option to cancel the lease if the lessee failed to achieve certain annual gross sales within 3 years. Bullitt also challenges the determination that Prager's, Inc., the plaintiff-lessee, paid rent higher than required by the modified lease. The excess payments were found to have been paid under "business compulsion" which entitled Prager's to reimbursement. Finally, Bullitt appeals from the court's failure to grant its cross-claim for reimbursement of sewer and water charges incurred for Prager's air-conditioning system.

## THE RECAPTURE CLAUSE

Assignments of error 10-13, 15, 17 and 18, which pertain to modification of the recapture clause, are not well taken. The findings of fact to which they relate are sup-

ported by substantial evidence or reasonable inferences drawn therefrom. They will not be disturbed on appeal. *Wells v. Scott,* 75 Wn.2d 922, 454 P.2d 378 (1969). We will not substitute our judgment for that of the trial court. *Sander v. Wells,* 71 Wn.2d 25, 426 P.2d 481 (1967).

■ Findings of fact 2 and 5 (assignments of error 10 and 12) do deviate from the statement of facts. Nevertheless, they do so in minor matters not relevant to the issues before this court. The error, if any, is harmless and thus not reversible. *McLeod v. Keith,* 69 Wn.2d 201, 417 P.2d 861 (1966); *State ex rel. Carriger v. Campbell Food Markets, Inc.,* 65 Wn.2d 600, 398 P.2d 1016 (1965).

The parties originally entered into a lease in 1942. The new lease which became effective on January 1, 1960, provided for a low initial rent based upon a percentage of the current annual gross sales. However, within 1 of the first 3 years (1960, 1961 or 1962), Prager's was required to achieve annual gross sales of at least $1,000,000 to support an annual rental of at least $50,000. Section 4 of the lease (the recapture clause) provided Bullitt with an option to cancel the lease if Prager's failed to meet the annual gross sales figures. Bullitt's only duty was to give Prager's notice of cancellation between December 31, 1962, and March 31, 1963.

Section 28 of the lease also required Prager's to remodel at its own expense, with all reasonable dispatch compatible with keeping the business in operation. Based on an architect's sketch the parties contemplated the cost would range between $47,000 and $125,000. When the final plans were received in May and June of 1960, however, the parties learned that the cost estimates ranged from $54,800 to $189,742, depending upon the extent and quality of the project selected.

Bullitt indicated a desire for a first-class remodeling job because it would benefit the building. Prager's also preferred the most costly plan, but indicated it could not undertake the excessive expense if the recapture clause remained in the lease.

Bullitt inquired about the time needed for completion. Prager's architect felt it could be completed around February 1, 1961, if promptly commenced (*e.g.* a 5½-month project). Thereafter Bullitt indicated the estimates would be reviewed and that it would consider deletion of the recapture clause.

On October 19, 1960, Prager's received written notification that Bullitt approved of the plans and would delete the recapture clause provided the construction was promptly started and diligently prosecuted to completion by February 1, 1961. Prager's informed Mr. Yates (real estate manager for Bullitt) that the delay in receiving approval made it impossible to complete the project by February 1, 1961. As a result, Yates changed the proviso to read:

> provided the construction is now promptly started and diligently prosecuted *substantially* to completion by February 1, 1961.

(Italics ours.)

The formal modification agreement was executed October 26, 1960, and insofar as applicable, read as follows:

### I.

That paragraph 4 entitled "Change in Minimum Rental". . . *is* hereby *cancelled, annulled and deleted in its entirety.*

### II.

This modification is conditioned upon the Lessee promptly starting the construction of the interior and exterior alterations of the premises in accordance with the architect's plans which have been approved by Lessor, and such construction diligently prosecuted and substantially completed by February 1, 1961.

(Italics ours.) Work was commenced November 2, 1960. The contract called for an expenditure of $175,679.33.

Shortly after Thanksgiving, Prager's informed Bullitt the Christmas rush had impeded remodeling. Prager's requested permission to close the store temporarily and reopen in a nearby building partially owned by Bullitt. Mr. Yates stated that section 28 of the lease required Prager's

to keep the "business operating on the premises during the remodeling work." He added that Prager's would be expected to pay rent on both premises even if permitted to move. The idea was abandoned.

Thereafter Bullitt's president and Mr. Yates observed the project's progress almost daily. It was only 60.8 per cent completed by February 1, 1961, and had progressed only to 74.5 per cent by the end of February. Nevertheless, Bullitt made no objection.

While the work was in progress a dispute arose over rental adjustments under clause 5 of the lease. On May 9, 1961, Prager's attorney met with Mr. Whetzel, attorney and general manager for Bullitt, to resolve the problem. Mr. Whetzel's memorandum of the meeting indicates he told Prager's attorney that if a lawsuit developed Bullitt would have "a chance to open up the modification agreement, particularly since the work was not substantially completed by February 1, 1961, . . ." The memorandum also made reference to "a reinstatement of the recapture option, . . ." Prager's did not thereafter attempt to litigate the dispute.

Bullitt made no further reference to the completion date, "opening up the modification agreement" or "reinstatement of the recapture option." The project was finally completed May 31, 1961, and a few days later Mr. Yates, as Bullitt's representative, participated in the formal ribbon cutting.

Prager's gross sales failed to exceed $1,000,000 during 1960, 1961 or 1962. Although the figures could have been achieved by holding sales at a sacrifice of profit, Prager's felt no need to do so because of the assumption that the recapture clause had been canceled.

On March 22, 1963, Bullitt notified Prager's by letter that the recapture clause would be exercised. Bullitt asserted the modification agreement was of no force and effect because the remodeling had not been substantially completed by February 1, 1961. The trial court found the letter to be the first *effective* notice of Bullitt's intention to treat the modification agreement as a nullity. There is substantial

evidence or reasonable inference to be drawn therefrom to support the finding of fact. We shall not disturb it. *Wells v. Scott, supra; Sander v. Wells, supra.* Contrary to Bullitt's assertion, Mr. Whetzel's memorandum of the May 9, 1961, meeting does not indicate Prager's received notice that Bullitt considered the modification agreement a nullity.

The recapture clause authorized Prager's to reinstate the lease by increasing the minimum monthly rent to $4,166.67 commencing January 1, 1963. The option was exercised and the additional amount was paid under protest. Prager's explained that since the remodeling costs had exceeded $170,000, it could not afford to forfeit the lease.

Prager's instituted this action to set aside cancellation of the lease under the recapture clause and for a refund of the excess minimum monthly rental paid to reinstate the lease. Bullitt appeals from an adverse decision.

Bullitt's position is simple. Paragraph 2 of the modification agreement begins, "This modification is conditioned upon . . ." Thus, it is urged that compliance with paragraph 2 was a condition precedent to cancellation of the recapture clause. Inasmuch as Prager's failed to comply with the condition precedent, the recapture clause was not canceled.

Bullitt argues further that the modification agreement was an entity separate and distinct from the lease and contained no notice requirement. Therefore, Bullitt was under no duty to notify Prager's of its intention to rely on a failure of the condition precedent.

Prager's position is equally clear. The modification agreement is not an isolated document. It must be construed with the basic lease. When so considered paragraph 1 of the agreement canceled, annulled and deleted the recapture clause at the time the parties executed the modification agreement. Further, paragraph 2 is not an isolated condition precedent but is part of Prager's covenant contained in paragraph 28 of the lease. Thus, paragraphs 21 and 25 of the lease entitled Prager's to 30 days' written notice of any breach upon which Bullitt intended to assert an option to

terminate the lease. Bullitt by having failed to give the required written notice, waived the option. Furthermore, if Prager's breached the covenant by failure to substantially complete the project by February 1, 1961, Bullitt is not entitled to rescind the modification agreement and reinstate the recapture clause. Bullitt permitted Prager's to expend the money necessary for completion, and thereafter accepted the benefits of the project. The issue was not raised until nearly 2 years later.

The modification agreement, standing alone, is ambiguous. Paragraph 1, couched in the present tense, refers to a legal right presently consummated: "That paragraph 4 [the recapture clause] . . . *be* and the same *is hereby* cancelled, annulled and deleted in its entirety." (Italics ours.) On the other hand, paragraph 2 is couched in both present and future tenses by providing: "This modification *is* conditioned upon the Lessee . . ." (italics ours) performing acts that can only be accomplished in the *future*. If Bullitt correctly assumes that paragraph 2 contains a condition, it is not clear whether substantial completion of the project is a condition *precedent* to cancellation of the recapture clause or a condition *subsequent* to reactivation of a previously canceled recapture clause.

There is other evidence of ambiguity. It is not possible to determine the legal relationship of the parties by reference to the modification agreement. The bounds of Prager's undertaking cannot be determined without reading paragraph 2 of the modification agreement in light of paragraph 28 of the basic lease.

■ Language is often an unreliable instrument because words do not define themselves and clauses in contracts do not automatically apply themselves to performance. The meaning of words, terms and clauses consists of ideas induced in the minds of the contracting parties. Often, by the time the contract reaches the state of litigation, words, terms and clauses once thought to be clear have ceased to convey the same meaning to the parties. Thus, the process of interpretation of words and phrases and the construing

of contracts must take place in light of the entire context of the transaction prior to litigation. 3 A. Corbin, Contracts § 536 (1960); Restatement of Contracts § 235(c) (1932).

The determination of the legal operation of a contract (*e.g.* its construction by the court) is quite different from the mere interpretation of its language. This is particularly true when, as here, we are concerned with the relative importance of performance or nonperformance by the parties. 3 A. Corbin, Contracts § 534 (1960); 5A A. Corbin, Contracts § 1175 (1960). While the construction of a contract may start with an interpretation of its language, it does not end there. 3 A. Corbin, Contracts § 534 (1960).

In interpreting ambiguous language of a contract, as well as in construing ambiguous clauses therein, one must consider the surrounding circumstances. Restatement of Contracts § 235(d) (1932); 17 Am. Jur. 2d *Contracts* § 272. One must also consider the relations of the parties, the character of the business and the purposes sought to be achieved by the contract. 5A A. Corbin, Contracts § 1175 (1960); 17 Am. Jur. 2d *Contracts* § 246 at 637. One should also consider the action of the parties, with reference to the contract, prior to the time of actual litigation. 17 Am. Jur. 2d *Contracts* § 274 at 685. The practical application of the contract, when acted on by both parties, frequently provides an excellent means of understanding the manner in which the parties intended the ambiguous language or contract to be interpreted or construed. If the parties have given the contract a reasonable interpretation or construction, its meaning should be adopted. 3 A. Corbin, Contracts § 538, 558 (1960); Restatement of Contracts § 235(e) (1932); 17 Am. Jur. 2d *Contracts* § 274; *Kennedy v. Weyerhaeuser Timber Co.*, 54 Wn.2d 766, 344 P.2d 1025 (1959); *Tone v. Parlaman*, 154 Wash. 389, 282 P. 208 (1929); *Nelson v. Western Steam Nav. Co.*, 52 Wash. 177, 100 P. 325 (1909); *Doll v. Maravilas*, 82 Cal. App. 2d 943, 187 P.2d 885 (1947). We thus turn to the interpretative conduct of the parties.

The first issue is whether the modification agreement was intended to be an isolated document or part of a total contract composed of the lease and agreement.

Although drafted as a separate instrument it is obvious the modification agreement was not intended to operate as an isolated document which created isolated rights and obligations. The legal relationship of the parties was not expected to exist in a vacuum.

The context of the entire transaction as well as the actions of the parties prior to their "falling out" make it clear that Prager's obligation entailed much more than mere substantial completion of an approved project by February 1, 1961. For example, at the time Prager's found the project was impeded by the Christmas trade, it asked Bullitt for permission to close temporarily and reopen in another location. Nothing contained in the modification agreement would have prevented Prager's from so doing. Nevertheless, Bullitt treated the lease and agreement as one contract and, relying on paragraph 28 of the lease, required Prager's to continue its business "on the premises during the remodeling work." Prager's acceded to that interpretation, remained on the premises and continued to remodel during the Christmas sales.

The parties originally treated the two documents as integral parts of a total contract. We will adhere to their reasonable interpretation.

The next issue is whether paragraph 2 of the modification agreement was a condition precedent to cancellation of the recapture clause or whether paragraph 1 canceled the recapture clause completely and paragraph 2 was merely a covenant which created a duty of performance by Prager's.

The expression "condition" as used by the Restatement of Contracts and by Corbin on Contracts does not mean a mere "term", "expression", "provision", or any particular group of words used in a contract. It is an operative fact or event, an act or performance by a promisee upon which the existence of some particular legal relationship

depends. 3A A. Corbin, Contracts § 627 (1960); 5A A. Corbin, Contracts § 1175 (1960).

■ Considering the foregoing, as well as the need to interpret ambiguous words and construe ambiguous clauses, we turn to some basic rules of construction. Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise. 3A A. Corbin, Contracts § 635 (1960); Restatement of Contracts § 261 (1932). The Restatement of Contracts § 260 (1932) provides further:

> If in an agreement words that state that an act is to be performed purport to be the words of the person who is to do the act, the words are interpreted, unless a contrary intention has been manifested, as a promise by that person to perform the act.

The foregoing rules coincide with the parties' practical interpretation prior to the time they changed their relationship in an attempt to prevail in the current litigation.

The purpose of the lease was to provide for the rental of store space and for remodeling the area at Prager's expense. The lease also contained a recapture clause. Subsequent to the execution of the lease the parties discussed a far more expensive remodeling project. Both felt they would benefit. Nevertheless, there is both evidence and a reasonable inference to be drawn therefrom that while Prager's was willing to expend the sums originally contemplated, it was unwilling to be obligated for a remodeling project estimated at $189,742 as long as the recapture clause remained in the lease. The expenditure was thought to be out of the question because Prager's could lose the entire investment too easily.

It is reasonable to conclude that dual purposes were served by the modification agreement. The first was to eliminate the recapture clause to obtain Prager's expenditure of extensive funds that would otherwise have been unavailable. The second was to obligate Prager's to perform the extensive remodeling.

A new relationship was created in which Bullitt exchanged an act (*i.e.* immediate cancellation of the recap-

ture clause) for a promise (*i.e.* Prager's would expend a large sum of money on a preapproved construction project, and would proceed diligently to substantial completion by February 1, 1961).

The subsequent acts of the parties make it clear that paragraph 1 was not subject to future cancellation by fulfillment of a condition precedent. It was intended to mean just what it said. The recapture clause was "cancelled, annulled and deleted" when the agreement was executed. The previously mentioned Whetzel memorandum, which reflected Bullitt's position prior to litigation, supports this interpretation. The memorandum indicated that if Prager's took certain steps (unrelated to this dispute) it "would give Bullitt . . . *a chance to open up* the modification agreement, particularly since the work was not substantially completed by February 1, 1961, . . ." (Italics ours). A party does not "open up" a transaction unless it has previously been closed. Further, the memorandum referred to "reinstatement of the recapture option." If the recapture provision had not been canceled it would not have been necessary to reinstate it. To reinstate means to place again in a former state or condition, to restore to a state or position from which the object has been removed. Black's Law Dictionary 1452 (4th ed. 1951). Finally, Prager's did expend in excess of $170,000 on the project. Both parties knew it would not have been expended but for the deletion of the recapture clause.

Thus, prior to the instant dispute, the parties indicated by their own action that the recapture clause was a dead issue. Their practical interpretation is reasonable and will be followed. The trial court found correctly, "That on October 26, 1960 the Lease was formally modified . . ." Assignment of error No. 14 is not well taken.

The modified lease gave Bullitt several options. It had a right of action for provable damages for breach of the covenant caused by untimely completion. Since Bullitt did not follow this course, it will not be discussed.

Bullitt could have rescinded the modification agree-

ment for failure of substantial performance within the specified time limit. By so doing it could have reinstated the recapture clause. Nevertheless, Bullitt remained silent and permitted Prager's to expend the additional money and complete the project. In short, Bullitt accepted the performance and resultant benefits even though untimely. Bullitt may not rescind at this late date. 17 Am. Jur. 2d *Contracts* § 489 at 961. Failure to rescind within a reasonable time of the breach is conduct indicating an election to continue the contract. *Longenecker v. Brommer,* 59 Wn.2d 552, 368 P.2d 900 (1962); *Lawrence County v. Stewart,* 72 Ark. 525, 81 S.W. 1059 (1904); 5 Williston, Contracts §§ 683, 684, 687, 688 (3d ed. 1961); Restatement of Contracts § 309 (1932); 32 Am. Jur. *Landlord and Tenant* § 882 (1941).

Finally, Bullitt had an option to terminate the lease under paragraph 21 of the lease:

> [I]n the event that the Lessee shall make default in any of the covenants or agreements of this lease, . . . then Lessor, may, after thirty (30) days notice of default, at its option, terminate this lease, . . ."

Section 25 required such notice to be in writing if the option was exercised. Bullitt did not exercise the option. Since the recapture clause was "cancelled, annulled and deleted," Bullitt had no right to terminate the lease 2 years later for failure to achieve the increased gross sales.

To this extent the trial court is affirmed.

### THE SEWER CHARGES

The parties had a tacit understanding that the ordinary water and sewer charges attributable to the lavatory would be paid by Bullitt. A dispute arose over the payment of water and sewer charges attributable to Prager's drinking fountain and air-conditioning system.

Although an air-conditioning system was required by the plans, the type was not specified. The system installed by Prager's caused a substantial increase in water consumption. The sewer charges, based upon water consumption, were thus increased.

Shortly after the system was installed Bullitt became aware of an increase in the building's water consumption but did not know the cause. On May 22, 1964, a meter was installed to measure the water used by Prager's fountain and air-conditioning system. Thereafter Prager's was charged for the metered water consumption and sewer charges made by the Municipality of Metropolitan Seattle ("Metro").

Bullitt asserts it is entitled to recover $3,579.30 as reasonable water and "Metro" sewer charges for the period that preceded installation of the meter. This claim is based upon an assumption that the metered consumption was a reasonable gauge of the unmetered consumption. The trial court refused to admit evidence of a nonexpert's estimate of the unmetered consumption based on such figures. Bullitt assigns this as error. We do not agree.

The estimate assumed continuous use of the drinking fountain. There is no evidence, however, when the fountain was installed or the extent of its use. Furthermore, there is nothing to indicate the extent to which the air-conditioning system was used during the unmetered period, or whether the use was similar to that of the metered period. The admissibility of such evidence rests in the sound discretion of the trial court. *Washington v. Seattle,* 170 Wash. 371, 16 P.2d 597, 86 A.L.R. 113 (1932). No adequate similarity was shown between the circumstances or conditions prevailing at the time of the so-called experiment. The evidence was properly excluded. *Cowan v. Chicago, M., St. P. & P. R.R.,* 55 Wn.2d 615, 349 P.2d 218 (1960); C. McCormick, Law of Evidence § 169 (1954).

The parties concede that Prager's should reimburse Bullitt for water charges attributable to the metered water used in the air-conditioning system between March 22, 1964, and April 1, 1966. The trial court found, however, there was no relationship between the volume of water consumed and the amount of sewage discharged (which is the basis for the "Metro" sewer charge). It also concluded that the "Metro" sewer charge was a tax and thus chargeable to

Bullitt as the lessor. Bullitt's assignments of error 7, 19, 20 and 21 are well taken.

Bullitt does not challenge the theory that absent a provision in a lease, the burden of taxes should fall on the lessor. It asserts, however, that the "Metro" sewer charges are not taxes, but are based upon the amount of water consumed and thus should be charged to the user for services rendered.

■ Although we have not considered the question previously, other courts have held that sewer usage is reasonably related to water use. They have also held sewer rates based thereon to be reasonable charges and not taxes. We agree. *State v. Miami*, 157 Fla. 726, 27 So. 2d 118 (1946); *Maryville v. Cushman*, 363 Mo. 87, 249 S.W.2d 347 (1952); *Gericke v. Philadelphia*, 353 Pa. 60, 44 A.2d 233 (1945); *Bexar County v. San Antonio*, 352 S.W.2d 905 (Tex. Civ. App. 1961). See also Rhyne, Municipal Law, 462 (1957).

Prager's contends that *Municipality of Metro. Seattle v. Seattle*, 57 Wn.2d 446, 357 P.2d 863 (1960) supports the position that sewer charges are a tax. The case does not so hold. It was concerned with the power of "Metro," as a regional municipal corporation, to impose necessary real property taxes to carry out the purpose of the act. However, recognition of that power is not to be equated with a determination that charges or fees made for services rendered to individual inhabitants are taxes. In fact RCW 35.58.200(4) recognizes that in addition to other powers enumerated, "Metro" also has the power to:

> fix *rates* and *charges* for the use of metropolitan sewage disposal . . . facilities.

(Italics ours.)

The rates or charges made are not taxes. They are in the nature of tolls paid for services furnished. 11 E. McQuillin, Municipal Corporations § 31.30a at 248 (3d ed. rev. 1964).

Bullitt is entitled to recover for the past metered water charges attributable to the fountain and air-conditioning system and for the "Metro" sewer charges based thereon. Bullitt is also entitled to reimbursement for metered water

charges, and "Metro" sewer charges based thereon, during the balance of the lease. To the extent that the trial court's judgment is inconsistent herewith, it is reversed.

The cause is remanded to permit the trial court to determine the correct metered water charges and sewer charges and to render a judgment based thereon.

HOROWITZ, A. C. J., and UTTER, J., concur.