**In re PBA TOUR GEAR, INC., IAMG Holdings, Inc., Debtors.**

**PBA Tour Gear, Inc. and IAMG Holdings, Inc., Plaintiffs,**

v.

**Professional Bowlers Association, LLC and Brunswick Bowling & Billiards, Inc., Defendants.**

Bankruptcy Nos. 802–82195– 478, 802–82835–478.
Adversary No. 802–8168–478.

United States Bankruptcy Court, E.D. New York.

Nov. 14, 2003.

Shaw Licitra Bohner Esernio, Schwartz & Pfluger, P.C., by Stuart Gordon, Garden City, NY, for Debtor.

Rivkin Radler LLP, by Celeste M. Butera, Uniondale, NY, Special Litigation Counsel to Debtor.

Christensen O'Connor Johnson Kindness PLLP, by Steven V. Gibbons, Seattle, WA, for Professional Bowlers Association LLC.

Curtis Mallet–Prevost Colt & Mosle LLP, by Marc R. Milano, New York City, Co–Counsel for Professional Bowlers Association, LLP.

Abelman, Frayne & Schwab, by Richard Crisona, New York City, for Brunswick Bowling & Billiards, Inc.

## AMENDED DECISION DENYING SUMMARY JUDGMENT ON ISSUE OF WAIVER

DOROTHY EISENBERG, Bankruptcy Judge.

PBA Tour Gear, Inc. ("Tour Gear") and IAMG Holdings, Inc. ("IAMG Holdings"), Chapter 11 debtors (Tour Gear and IAMG Holdings collectively referred to as the "Debtors" or the "Plaintiffs"), commenced an adversary proceeding against numerous parties, including the Professional Bowlers Association LLC (the "PBA") and Brunswick Bowling & Billiards, Inc. ("Brunswick"), alleging numerous causes of action. The adversary complaint, as amended, was dismissed as to all defendants except the PBA and Brunswick (collectively, the "Defendants"). The controversy arises out of a license agreement (the "License Agreement") regarding the PBA's proprietary marks, entered into between the PBA, as licensor, and IAMG Group, Ltd. (sometimes referred to herein as "IAM"), the predecessor-in-interest to IAMG Holdings, as licensee, in May 1999 and amended on January 26, 2000, March 20, 2001 (the "March 20th Amendment") and May 1, 2001 (the "May 1st Amendment"). Before the Court is a motion by the PBA to dismiss certain causes of action in the Third Amended Adversary Complaint, which the Court has previously deemed a motion for partial summary judgment (the "Summary Judgment Motion"),[1] requesting, among other things, (a) a ruling that the March 20th and the May 1st Amendments to the License Agreement are valid and enforceable as a matter of law, based on waiver by the Debtors; (b) dismissal of any claim asserted by the Debtors that arose prior to March 20, 2001 (claims related to changes in logo patch design; changes in logo patch placement on the shirts of the professional bowlers; claims related to sponsorship and product registration; claims related to manufacture of bowling bag tags and of other "giveaway" items; and claims related to the manufacture and sale of bowling balls and pins); (c) dismissal of any claim related to the Debtors' failure to obtain financing from Equity Merchants Banking Corporation ("EMBC") or any other lender due to conduct of the PBA; and (d) dismissal of the Debtors' claim for rescission of the March 20th Amendment for failure of consideration. The PBA also requests partial summary judgment terminating the License

---

1. The PBA commenced a third-party proceeding against third-party defendants William E. Weber, Waxman & Wincott, P.C., Ann Rochler, Douglas Rochler and IAMG.com, Inc., which has recently been dismissed with respect to defendants Weber and Waxman & Wincott, P.C. The claims asserted by the PBA in its third-party complaint are unrelated to the matters currently before the Court in connection with the Summary Judgment Motion, and the Court makes no determination in this decision regarding the claims asserted in the third-party complaint.

Agreement because of the Debtors' assertion of claims in this action in alleged violation of the March 20th and May 1st Amendments to the License Agreement. The Plaintiffs filed various documents in opposition to the Summary Judgment Motion, including a memorandum of law and an amended memorandum of law.

The Court conducted a hearing on the PBA's Summary Judgment Motion and the Plaintiffs' opposition thereto on January 13, 2003, at which were present counsel to the Plaintiffs, the PBA and Brunswick. As part of their opposition to the instant motion, the Plaintiffs submitted a notarized statement from Mr. George Schwartz, an employee of EMBC who was responsible for negotiating with the PBA certain terms of the financing sought by IAMG Holdings, which raised issues of fact requiring an evidentiary hearing.[2] By Decision and Order dated February 7, 2003, as amended on February 11, 2003, the Court found that a determination of the Summary Judgment Motion required the interpretation and construction of the March 20th Amendment to the License Agreement. The Court further found that Paragraph 2 of the March 20th Amendment contains a condition precedent to the effect that the rights conferred to the PBA by the amendment "shall immediately vest in the PBA upon execution [of the March 20th Amendment] *and the completion of PBA's good faith discussions with EMBC with respect to the requested assignment of the License by IAM to EMBC*" (3/20/01 Amendment, ¶ 2, emphasis supplied), and that an evidentiary hearing was necessary. Accordingly, hearings were held on April 3, 4, and 30, 2003 and May 1, 2003.

After consideration of the Summary Judgment Motion, the opposition thereto, the memoranda of law filed by the Plaintiffs and the PBA, the testimony of the witnesses, the documentary evidence presented at the hearing, and the post-trial filings, the Court has determined that, as a matter of law, the March 20th Amendment cannot be enforced for failure of consideration. Said amendment is rescinded and the causes of action which accrued prior to the execution of said amendment were not waived by IAMG Holdings. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

### FINDINGS OF FACT

1. In October 2000, IAMG Holdings advised the PBA of its efforts to obtain financing. (4/4/03 Tr., p. 24). Jahn Avarello, President of IAMG Holdings and Hal Wolfe, an investment advisor hired by IAMG Holdings to assist it in its efforts to raise capital, advised PBA's attorney, and other representatives of the PBA of this fact during a meeting in New York in October 2000. (4/4/03 Tr., p. 23).

2. EMBC was initially contacted as a potential lender for IAMG Holdings through Hal Wolfe, of International Technologies and Finance, LLC. (4/4/03 Tr., p. 144–45; 5/1/03 Tr., p. 134). George Schwartz was an employee of EMBC with primary responsibility for obtaining funding for IAMG Holdings. Stacie Daley is in-house counsel for EMBC.

---

**2.** The Court considered the notarized statement of George Schwartz even though the PBA objected to its admissibility, for reasons more fully set forth in the Court's Decision and Order dated February 7, 2003, as amended on February 11, 2003. Prior to the evidentiary hearing, the PBA was able to depose Mr. Schwartz. Moreover, Mr. Schwartz reaffirmed the statements contained in his notarized statement at the hearing, at which time he was subject to cross-examination.

3. During its due diligence, EMBC discovered that the assets of IAMG Holdings, other than its License with the PBA, were insufficient to secure the amount of financing IAMG Holdings required. (4/4/03 Tr., pp. 171–74; 5/1/03 Tr., p. 134). Accordingly, the License became the centerpiece of the financing transaction.

4. IAMG Holdings received and provided to EMBC a valuation of the License, which estimated the value of the License at $16 million. (4/4/03 Tr., p. 147; Plaintiff's Exh. 4).

5. EMBC contacted Connecticut Bank of Commerce ("CBC") to act as a lender for IAMG Holdings.[3] (4/4/03 Tr., p. 161). The Senior Vice–President of CBC in charge of the Structured Finance Group with direct responsibility for the IAMG Holdings loan, advised Mr. Schwartz that CBC would require an assignment of the License by IAMG Holdings as a condition precedent to closing the loan. (5/1/03 Tr., pp. 122–24). Further, CBC would require the assignment of the License to contain a "put." (5/1/03 Tr., pp. 107, 122–23, 128).

6. A "put" is a device whereby, in the event of a default by IAMG Holdings, CBC would be able to sell the license back to the PBA for an agreed upon cash amount. (4/4/03 Tr., p. 155; 5/1/03 Tr., p. 61). EMBC and CBC required an assignment and a "put" as an element of the assignment because of the fractious relationship and dealings between the PBA and its licensee, IAMG Holdings. (5/1/03 Tr., pp. 122–24, 129–30).

7. Mr. Schwartz advised Jahn Avarello that, in order to proceed with the loan, IAMG Holdings must assign the PBA License to EMBC, which assignment must contain a "put," and that EMBC required that the PBA consent to an assignment of the License in order for IAMG Holdings to obtain the financing. (4/4/03 Tr., p. 33; 4/30/03 Tr., pp. 38–39).[4]

8. The PBA, through its general counsel, spoke with Mr. Schwartz and Mr. Avarello in early March 2001 regarding the status of IAMG Holdings' efforts to secure financing. (4/30/03 Tr., pp. 38–39; 4/4/03 Tr., p. 63). At that time, the PBA was advised that EMBC was working with CBC as a potential lender for IAMG Holdings. (4/30/03 Tr., pp. 39–40).

9. IAMG Holdings clearly needed the PBA's consent to the assignment of the License to EMBC pursuant to paragraph 7 of the May 1, 1999 License Agreement, which provides as follows:

The rights and benefits conferred upon IAMG Group hereunder shall inure to the sole benefit of IAM Group, shall not be deemed to be coupled with an interest and shall not, in whole or in part, be *assigned, sublicensed, or otherwise transferred* by IAM Group to any third party *without the prior consent of PBA, which PBA may withhold in its sole discretion* . . . .

(Plaintiffs' Exh. 2, ¶ 7 at p. 8, emphasis supplied).

10. IAMG Holdings needed PBA's consent to assign or hypothecate the License-

---

3. EMBC and CBC are affiliated entities, as they are each controlled by the same principal. (5/1/03 Tr., pp. 66–67). Richard Berritt of CBC testified that Hal Wolfe originally approached CBC as a prospective lender for IAMG Holdings, and that CBC referred the file to EMBC. That account conflicts George Schwartz' testimony, in that Mr. Schwartz recalled that he was contacted directly by Hal Wolfe regarding financing for IAMG Holdings. (4/4/03 Tr., pp. 144–45). However, this discrepancy does not materially affect any of the Court's factual findings.

4. Mr. Berritt testified that CBC also required an assignment of the PBA License and a "put," in order to approve a loan to IAMG Holdings. (5/1/03 Tr., p. 59).

to use the License as collateral for a loan pursuant to the License Agreement. (Plaintiffs' Exh. 2, ¶ 7 at p. 8). Hypothecation by IAMG Holdings requires a pledge of a security interest in the License to EMBC. In the event of default, the lender could obtain the Debtor's rights in the License Agreement.

11. In order to obtain the PBA's consent to the assignment of the License required by EMBC and CBC, IAMG Holdings entered into negotiations with the PBA, which resulted in the execution of the March 20th Amendment to the License Agreement. The March 20th Amendment to the License Agreement provides, in pertinent part, the following:

WHEREAS, IAM is seeking to negotiate a credit facility and close on a Phase 1 Bridge Loan with Equity Merchant Banking Corporation ("EMBC") whereby it is being required to pledge its rights and interest in the License to EMBC as collateral security for Bridge Loan; and

WHEREAS, IAM is requesting PBA to consent to the assignment of the license to EMBC as collateral security for the Bridge Loan; and

WHEREAS, PBA has the absolute right under the License to withhold its consent to the assignment of the License in its sole discretion; and

WHEREAS, PBA is willing in consideration for certain promises and representations made herein by IAM, to assist IAM in closing on the EMBC Bridge Loan by negotiating with EMBC to structure an understanding so that IAM may be allowed to transfer the License and close on the Bridge Loan.

NOW, THEREFORE, in consideration of the mutual representations, warranties and agreements contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. In return for *PBA's agreement to attempt to negotiate certain conditions with EMBC upon which PBA will consent to IAM's assignment of the License* to EMBC, the parties

(a) . . . warrant and agree that neither party is aware of any claims, one against the other, relating to the license at the time of the execution of this Agreement.

(b) . . . IAM agrees to waive any claims known or unknown, which it may now have against the PBA, or its officers, directors, employees, members . . . with respect to the License and any and all rights conferred, or expected to be conferred, thereunder. This waiver shall extend to any claims known or unknown, which arise or may have arisen prior to the date of this Agreement. The waiver of such claims shall apply to all aspects of the License, including but not limited to, the manner in which it has been managed, administered and enforced by the PBA, or executed by IAM. IAM understands, agrees and acknowledges that by this Agreement, it is forever barred from bringing any action, judicial or administrative, or any claim . . . against the PBA, or its officers, directors, employees . . . from the beginning of time to the date of the execution of this Agreement with respect to this License or the rights granted thereby in any manner, shape or form.

\* \* \* \* \* \*

2. The failure of IAM to close on its Bridge Loan with EMBC, or to ultimately receive a loan under terms and conditions that IAM deems satisfactory,

shall not in any way affect the rights being granted to the PBA hereunder. *These rights shall immediately vest in the PBA upon execution hereof and the completion of PBA's good faith discussions with EMBC with respect to the requested assignment of the License by IAM to EMBC.* (Plaintiffs' Exh. 31, emphasis supplied).

12. The Court finds that the language contained in the March 20th Amendment required PBA to negotiate with EMBC in good faith so that the Debtor would be granted PBA's authorization to transfer its interest by way of a pledge as a security interest in the Licence to EMBC, the purported lender.

13. Although the PBA made no promise to permit the transfer or hypothecation of the Licence, the PBA required the Debtor to agree to waive any claims, known or unknown, which it may have had against the PBA, whether past or present, with respect to the License and any and all rights conferred thereunder.

14. Paragraph 1 of the March 20th Amendment describes PBA's consideration for the waiver of claims by IAMG Holdings as merely *"PBA's agreement to attempt to negotiate certain conditions with EMBC* upon which PBA will consent to [the] assignment of the License." Paragraph 2 states that the *"PBA's rights under the amendment shall vest in the PBA upon execution thereof and the completion of PBA's good faith discussions with EMBC with respect to the requested assignment* of the License." The March 20th Amendment is ambiguous regarding the consideration which the PBA agreed to provide in return for IAMG

Holdings' immediate waiver of claims, while the remaining need for PBA to complete good faith discussions with EMBC with respect to the assignment had not yet taken place. It is further unclear whether PBA agreed to an assignment or only "agreed to attempt to negotiate" with EMBC regarding PBA's consent. The Court finds that PBA merely agreed to attempt to negotiate in good faith. Therefore, the Court must determine if PBA adequately performed its required good faith attempt to negotiate for the assignment or hypothecation to take place.

15. As the Court finds that the agreement at issue is ambiguous, the Court has taken into account parol evidence regarding the circumstances surrounding the execution of the March 20th Amendment, in order to determine the intention of the parties.

16. The March 20th Amendment was negotiated and executed on behalf of the PBA by counsel to the PBA,[5] and negotiated and executed on behalf of IAMG Holdings by Jahn Avarello, its President.

17. Mr. Avarello informed PBA's counsel prior to the drafting and execution of the March 20th Amendment that EMBC required an assignment of the License-a transfer of title to the License to the Lender-and that the title would be held in escrow, so that no foreclosure proceeding would be necessary in the event of a default by IAMG Holdings. (5/1/03 Tr., pp. 152, 154–55). Mr. Avarello also informed counsel, prior to the drafting and execution of the March 20th Amendment, that EMBC required that the consent to the assignment of the License also contain a

---

**5.** Counsel initially declined to testify at the hearing regarding the circumstances surrounding the execution of the March 20th Amendment, claiming attorney-client privilege. However, the Court found that he was not entitled to claim the privilege, as he was acting as a businessman, rather than an attorney, when he negotiated the terms of the March 20th Amendment on behalf of the PBA.

"put," the amount at which the PBA would agree to buy back its License from the lender. (5/1/03 Tr., pp. 154–55).

18. Mr. Schwartz and Ms. Daley also advised the PBA that the consent to the assignment of the License containing the "put" and the escrow provisions had to be executed in writing prior to the lender proceeding with approval of the loan. (5/1/03 Tr., pp. 109, 128–29; 4/4/03 Tr., pp. 155, 163–64).

19. It is undisputed that, under the License Agreement, the PBA had an absolute right to refuse to consent to an assignment of the License.

20. The PBA received, read and reviewed a letter dated March 13, 2001 from IAMG Holdings (Plaintiff's Exh. 20), enclosing a copy of a letter from EMBC setting forth the terms of its loan commitment (the "Draft Engagement Letter"). (Plaintiffs' Exh. 21). The third paragraph of the March 13, 2001 letter specifically states that, without the PBA's consent to the assignment of the License, there could be no closing of the EMBC loan. (Plaintiffs' Exh. 20). The Draft Engagement Letter also specifically lists the following condition to closing of the bridge loan: "[IAMG Holdings] *shall receive consent as to the transferability* of the [PBA License] in forms satisfactory to the Lender." (Plaintiff's Exh. 23, ¶ 11(xxvii)) (emphasis supplied). PBA's counsel prepared the first draft of the March 20th Amendment on or about March 15, 2003. (Plaintiffs' Exh. 23). Consequently, the PBA received and reviewed the March 13, 2001 letter from IAMG Holdings and the Draft Engagement Letter prior to the PBA drafting the March 20th Amendment.

21. Under cover of an e-mail dated March 15, 2001 to officers of IAMG Holdings, the PBA forwarded a first draft of the March 20th Amendment to IAMG Holdings for signature, describing it as the "Agreement we require in order to grant our consent to the assignment of our license to EMBC in connection with the financing package that you are negotiating with EMBC." (Plaintiffs' Exh. 22). The March 15th draft contained, among other things, a provision that the PBA would attempt to negotiate in good faith with EMBC regarding the terms under which it would consent to an assignment of the License and a release by IAMG Holdings of any and all claims it might have against the PBA under the License Agreement. Consequently, the PBA understood that without the PBA's consent to the assignment of the License, IAMG Holdings would not be able to secure its financing with EMBC. (4/30/03 Tr., p. 51).

22. According to its counsel, the PBA was not prepared to even consider an assignment of the License unless and until IAMG Holdings had agreed to release the PBA from any potential claims by executing the March 20th Amendment. (4/30/03 Tr., p. 55). Despite being aware that EMBC and CBC were requiring an assignment of the License, including a "put" and a provision whereby title would be held in escrow, there were no internal discussions between management and its counsel regarding the specific terms under which the PBA would consent to an assignment of the License before the execution of the March 20th Amendment, as the PBA was not prepared to address the matter until it had actually first obtained the release of all claims from IAMG Holdings. (4/30/03 Tr., pp. 56–57).

23. After reviewing the draft amendment prepared by PBA's counsel, IAMG Holdings requested that the amendment be revised so as to contain a mutual release of claims. In an e-mail dated March 16, 2001, written in response to IAMG's request, PBA's counsel states:

I have your suggested revision. I don't see why we should waive any rights we have against IAM as part of this Agreement (Paragraph 1(a)). We are being asked to give up something (our right to object to the assignment to EMBC) as a favor to you. We are willing to do so in return for your agreeing to do certain things for us. Why should we be asked to also give up our right to sue for anything that may have happened in the past? We obviously are not aware of anything or we would have proceeded to terminate the License, if that was our wish, previously. But, for example, if IAMG is fraudulently understating royalty reports and we to this point are not aware of it (but later learn) why should we be barred from bringing that action as a result of our willingness to cooperate with you on this transaction?

What the PBA wants is IAMG's agreement not to sue it at any time for anything that has happened under the License to this point in time. I believe that is eminently reasonable given the nature of your request. We are not, however, seeking to be released from anything that we may do in the future. We are both agreeing to abide by the License going forward. But, again, why should we have to give up some old claim that we may not presently know about as the "cost" of helping you out? (Plaintiffs' Exh. 25).

24. However, the PBA eventually agreed to the inclusion of the following provision in the March 20th Amendment regarding a release of its claims against IAMG Holdings:

PBA further agrees that it is unaware of any claims it may have against IAM for any failure to perform or any other defect which occurred prior to the execution of this Agreement with respect to the License or the rights granted thereby and waives any and all such claims except as to those claims, actions or proceedings related to IAMG's material omissions, misrepresentations or fraudulent acts.

(Plaintiffs' Exh. 31, ¶ 1(b)).

25. There were no other substantive changes to the amendment drafted by PBA's counsel on March 15, 2001. (4/30/03 Tr., p. 57).

26. Clearly, the parties were not on equal footing when the March 20th Amendment was drafted. The PBA was aware that IAMG Holdings desperately needed the loan and that the License Agreement required PBA to consent to an assignment of the License. The PBA would not even begin discussions with EMBC regarding the consent to the assignment of the License unless IAMG Holdings entered into the March 20th Amendment drafted by the PBA, by which IAMG Holdings waived all of its claims against the PBA which arose, or could have arisen, prior to the execution of the March 20th Amendment. (4/30/03 Tr., p. 55). PBA's counsel testified about "all the problems that had been at issue between the parties" prior to March 2001, including, but not limited to, "substantial claims that we had interfered with their ability to perform, that we had granted others the right to sell products that they felt were exclusive to them under their license, that we had improperly allowed people to download our logo and use it, [and] arguments over whether the patch ... was a product" covered by the License Agreement. (4/4/03 Tr., pp. 39–40). Counsel admitted that he "advised the PBA management and they agreed ... that it was wise to use this opportunity" to get "a release from all these claims that ... had predated the March 20 agreement." (4/4/03 Tr., p. 39–40). In fact, Mr. Avarel-

lo testified that he only signed the amendment because IAMG Holdings needed the funding to remain viable. (5/1/03 Tr., pp. 164–65, 206–07).

27. The PBA conducted two substantive conversations with EMBC on March 27 and 29, 2001, during which it discussed the terms under which it was willing to consent to allowing IAMG Holdings to use the License as collateral for a loan (4/30/03 Tr., pp. 87–89). During the first conversation with EMBC, the PBA rejected the idea of a "put." (4/4/03 Tr., p. 155. 4/30/03 Tr., p. 88).

28. After the aforementioned conversations, counsel drafted several versions of a proposed agreement between the PBA and EMBC, none of which was ever executed, regarding the terms under which the PBA would consent to an assignment of the License. (Plaintiffs' Exhs. 41, 42 and 48). All of said drafts provided that, in the event of a default by IAMG Holdings, EMBC would give the PBA a right of first refusal to repurchase the License "at a specified price and pursuant to terms that are readily quantifiable." (Plaintiffs' Exh. 41, 42 and 48, ¶ 4(a)). No purchase price is specified. All the drafts further provide that, in the event IAMG Holdings defaults on the loan, EMBC is required to foreclose on the License. (Plaintiffs' Exhs. 41, 42 and 48, ¶ 4). There is no provision for holding the License in escrow to eliminate the necessity of foreclosing thereon, nor any means or basis for evaluating PBA's right of first refusal.

29. The PBA never agreed to a "put"; i.e., the establishment of a price at which the PBA would buy back the License in the event of a default by IAMG Holdings under the Loan agreement, as required by EMBC and CBC in connection with the assignment of the License. (4/30/03 Tr., p. 64).

30. There is no credible evidence that the PBA ever consented to the assignment of the License to EMBC, CBC, or any other lender under the specific terms required by EMBC and CBC, or as would be required by any other lender. (4/30/03 Tr., pp. 64–65).

31. The PBA never agreed that title to the License could be held in escrow by EMBC or CBC pending satisfaction of the loan or payment of the negotiated "put" amount.

32. The Court finds that the March 20th Amendment refers to the PBA's consent to an assignment of the License to EMBC on some mutually acceptable terms negotiated by those parties. The evidence reveals that the parties did not find mutually acceptable terms. The Court further finds that PBA did not adequately assist IAMG Holdings in closing on the EMBC Bridge Loan by negotiating an appropriate means to enable the Debtor to obtain this financing.

If the PBA merely agreed to negotiate, this was insufficient consideration for the Debtor's overall waiver of any and all claims. The PBA agreed to negotiate in good faith, but the Court finds that its actions did not rise to the level of good faith negotiations, as the PBA failed to even suggest a value of the hypothecated license in the event the Debtor defaulted and the lender would then have certain rights to the collateral. Consequently, the condition precedent set forth in paragraph 2 of the March 20th Amendment was not satisfied, and the PBA's rights under the amendment never vested.

33. The Court finds that there was no mutual release of claims by the parties to the March 20th Amendment, as the PBA did not have any colorable claims against IAMG Holdings as of the date of execution thereof. (Plaintiffs' Exh. 25, ¶ 1).

34. It is the PBA's contention that, by execution of the March 20th Amendment, IAMG Holdings released and waived any and all claims it had against the PBA which arose prior thereto, in consideration of (a) the PBA giving up its absolute right to refuse to consent to an assignment of the License; (b) the PBA's agreement to negotiate in good faith with EMBC and to attempt to reach an agreement whereby it would consent to the assignment of the License; and (c) the PBA's release of any and all claims it had against IAMG Holdings other than claims sounding in fraud. (4/4/03 Tr. pp. 51–52). The Court finds that, based on the facts presented, this is insufficient consideration for IAMG Holdings' waiver of claims in the March 20th Amendment.

## *DISCUSSION*

Pursuant to Fed.R.Civ.P. 56, which is made applicable to bankruptcy proceedings by Fed. R. Bankr.P. 7056, the Court will grant summary judgment only in the absence of any material issue of fact, so as to make the movant entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Material facts" are those which might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden of showing that no genuine issue as to a material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material facts exists, the Court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In the case at bar, the Court determined that a genuine issue of material fact raised by the Plaintiffs required a hearing for the limited purpose of determining whether a condition precedent to the March 20th Amendment had been satisfied by the PBA, namely, the completion of good faith discussions between the PBA and EMBC regarding the terms upon which the PBA would consent to the assignment of the License, and whether the PBA ever consented to the assignment of the License. Having conducted that hearing, the Court now believes that there are no impediments to determining the Summary Judgment Motion.

 Property interests are created and defined by State law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. *Id.* Consequently, Bankruptcy Courts determine matters of property rights according to State law. *Morton v. National Bank of New York City*, 866 F.2d 561 (2d Cir.1989). Here, it is undisputed that the parties' respective rights vis-a-vis the License Agreement, as amended on March 20, 2001, are determined under the laws of the State of Washington. (Plaintiffs' Exh. 31, ¶ 4).

 This Court has previously held, in connection with the PBA's motion for reconsideration, that the March 20th Amendment is ambiguous. A written contract is ambiguous when its terms are uncertain or are capable of being understood in more than one manner. *Universal/Land Constr. Co. v. City of Spokane*, 49 Wash.App. 634, 637, 745 P.2d 53 (Wash. Ct.App.1987). Ambiguous contract language is to be construed against the party who drafted the contract. *Universal/Land*, 49 Wash.App. at 638, 745 P.2d at 54. Once a court has determined that the

contract is ambiguous, the court must look for the intent of the parties and the terms of the contract will be construed against the drafter of the contract. *Universal/Land,* 49 Wash.App. at 638, 745 P.2d at 54. Parol evidence is admissible to ascertain the intent of the parties and to properly construe the March 20th Amendment. *Lynott v. National Union Fire Ins. Co.,* 123 Wash.2d 678, 683, 871 P.2d 146, 149 (1994).

The March 20th Amendment, which was drafted by PBA's counsel, is ambiguous regarding what consideration the PBA agreed to provide in return for IAMG Holdings' immediate waiver of claims; i.e., was it PBA's consent to the assignment, or was it merely PBA's agreement to attempt to negotiate with EMBC regarding such consent? Was the PBA's waiver of claims against the Debtor sufficient by virtue of mutual release of claims? Accordingly, interpretation of this ambiguity shall be against the PBA, as the drafter of the document, and in favor of IAMG Holdings.

■ Even if the Court had not found that parol evidence was necessary because of the ambiguity of the amendment, the Court has reviewed the case law of Washington State regarding contract interpretation and finds that Washington courts apply the "context rule" in order to aid them in ascertaining the intent of the contracting parties. *Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222 (Wash.1990) ("Ambiguity in meaning of contract language need not exist before evidence of surrounding circumstance is admissible, but instead extrinsic evidence is admissible as to entire circumstances under which contract was made as an aid in ascertaining parties' intent"); *U.S. Life Credit Life Ins. Co. v. Williams,* 129 Wash.2d 565, 919 P.2d 594 (Wash.1996) ("To aid courts in ascertaining intent of parties to a contract, the 'context rule' may be used; under this rule extrinsic evidence is admissible to assist a court in ascertaining parties' intent and in interpreting the contract, and such evidence is admissible regardless of whether the contract language is deemed ambiguous"); *Bort v. Parker,* 110 Wash.App. 561, 42 P.3d 980 (Wash.Ct.App.2002).

> In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from viewing the contract as a whole, the subject matter and objective of the contract, all circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

*Bort,* 110 Wash.App. at 573, 42 P.3d at 987. Consequently, this Court has employed well recognized principles of Washington law by considering extrinsic evidence, as well as the contract language itself, to determine the intent of the parties.

■ Every contract must be supported by a consideration to be enforceable. *King v. Riveland,* 125 Wash.2d 500, 504, 886 P.2d 160, 164 (Wash.1994), *superseded by statute on other grounds as stated in Dependency of Q.L.M. v. State Dept. of Social and Health Services,* 105 Wash.App. 532, 20 P.3d 465 (Wash.App.Div. 2001). Consideration will support and render a promise enforceable if it was something bargained for. *Huberdeau v. Desmarais,* 79 Wash.2d 432, 440, 486 P.2d 1074, 1078 (Wash.1971), *citing* W. Shattuck, *Contracts in Washington, 1937–1957,* 34 Wash.L.Rev. 24, 49 (1959). Where there is a failure of consideration, the contract is not enforceable. *Huberdeau,* 79 Wash.2d at 439–40, 486 P.2d at 1078.

■ In considering the circumstances surrounding the making of the March 20th

Amendment, the Court finds that the parties were not on an equal footing. The PBA knew that IAMG Holdings desperately needed the loan and that the License Agreement required PBA's consent to an assignment of the License. The PBA would not even begin discussions with EMBC regarding consent to the assignment of the License unless IAMG Holdings entered into the March 20th Amendment drafted by its counsel. Mr. Avarello testified that he only signed the amendment because IAMG Holdings needed funding to remain viable. Consequently, the PBA had an unequal bargaining power which it used to obtain IAMG Holdings' signature on the March 20th Amendment.

The PBA contends that IAMG Holdings released and waived any and all claims it had against the PBA which arose prior to the execution of the March 20th Amendment, in consideration of (a) the PBA giving up its absolute right to refuse to consent to an assignment of the License; (b) the PBA's agreement to negotiate in good faith with EMBC and to attempt to reach an agreement whereby it would consent to the assignment of the License; and (c) the PBA's release of any and all claims it had against IAMG Holdings other than claims sounding in fraud. The Court disagrees with the PBA's contention that it gave good consideration for the Debtor's waiver of claims.

First, the Court finds that the PBA did not give up its right to refuse to consent to an assignment of the License. The PBA merely agreed to attempt to negotiate with EMBC to reach terms under which PBA would consent to the assignment of the License. The PBA could not give up its contractual right to refuse to permit an assignment unless it actually consented to such assignment. There is no credible evidence that the PBA ever consented to such an assignment upon the terms agreeable to EMBC and/or CBC (which included a "put" and an escrow arrangement).[6] Therefore, to the extent that the March 20th Amendment required actual consent to an assignment as consideration for the Debtor's waiver and release of claims against the PBA, there was a failure of consideration.

Further, the PBA's promise to attempt to negotiate with EMBC regarding the terms under which it would consent to an assignment is not sufficient or valid consideration to obtain a waiver of IAMG Holdings' claims. This is essentially only a promise to attempt to agree. The supposed promise is so indefinite and the performance "to attempt to negotiate" is entirely discretionary on the part of the PBA, that it is illusory as a matter of law. *Wharf Restaurant, Inc. v. Port of Seattle*, 24 Wash.App. 601, 609, 605 P.2d 334, 339 (1979) ("A supposed promise is illusory when it is so indefinite that it cannot be

---

**6.** The PBA conducted two substantive conversations with EMBC on March 27 and 29, 2001, during which it discussed the terms under which it was willing to consent to allowing IAMG Holdings to use the License as collateral for a loan. During the first conversation with EMBC, the PBA outright rejected the idea of a "put." Moreover, it was repeatedly expressed to the PBA that CBC required an assignment of the License and that title to the License must be held in escrow pending payment of the loan by IAMG Holdings. After these two substantive conversa-tions with EMBC, the PBA purportedly drafted documents that were described as "PBA's offer of conditions" under which the PBA would consent to IAMG Holdings using the License as collateral for a Loan. (Plaintiffs' Exhs. 41 and 42). The documents did not contain a consent to an assignment of the License or an escrow provision. These documents also did not contain a "put." Neither of these draft documents was ever finalized or executed. The PBA admits that these documents were not PBA's consent to an assignment of the License. (4/30/03 Tr., p. 80).

enforced or when its provisions are such as to make its performance optional or entirely discretionary on the part of the alleged promissor"); *Sandeman v. Sayres*, 50 Wash.2d 539, 541–42, 314 P.2d 428, 429 (Wash.1957) (same); *Badgett v. Security State Bank*, 116 Wash.2d 563, 574, 807 P.2d 356, 362 (Wash.1991) ("An agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete is unenforceable"). Consequently, the waiver of claims against PBA by IAMG Holdings based on PBA's "attempt to negotiate" with EMBC is invalid and unenforceable as a matter of law.

There is no basis in law for the PBA's proposition that an agreement to agree with a third party (EMBC) rather than a contract party (IAMG Holdings) cures the defect of indefiniteness. In fact, such an agreement as embodied in the March 20th Amendment is even more indefinite because the agreement to agree with a third party is entirely outside the control or influence of the contracting party, IAMG Holdings. Moreover, the PBA cites no cases in support of this distinction.

Additionally, as a factual matter, the Court finds that the PBA did not negotiate in good faith with EMBC regarding the requested assignment of the License. PBA's counsel had two substantive conversations with Mr. Schwartz and/or Ms. Daley regarding the terms of an assignment; rejected the requirement of the lender for a "put" and an escrow arrangement; drafted two documents which contained the PBA's offers of conditions to EMBC, which did not reflect an agreement between the parties; and never sought a response to these drafts. Based on the foregoing, the Court cannot establish by the PBA's conduct that it partook in any meaningful way in good faith negotiations regarding the terms and conditions upon which it would consent to an assignment of the License.

Second, the Court finds that the PBA's waiver and release of its claims against IAMG Holdings did not constitute consideration for IAMG Holdings' waiver and release of its claims against the PBA. Consideration may consist of an act, a forbearance, the creation, modification or destruction of a legal relationship, or a return promise given in exchange. *Huberdeau v. Desmarais*, 79 Wash.2d 432, 439, 486 P.2d 1074, 1078 (Wash.1971). The surrender of or forbearance to assert an invalid claim or defense by one who has neither an honest nor a reasonable belief in the validity of the claim or forbearance will not constitute consideration. *Id.* The PBA had no valid claims against IAMG Holdings to release at the time of the March 20th Amendment. PBA's counsel, in an e-mail to counsel to IAMG Holdings during the negotiation of the March 20th Amendment, stated the following:

> Why should we be asked to give up our right to sue for anything that may have happened in the past? *We obviously are not aware of anything or we would have proceeded to terminate the License*, if that was our wish previously.

(Plaintiffs' Exh. 25) (emphasis supplied). As the PBA admitted to having no claims against IAMG Holdings at the time the March 20th Amendment was executed, the waiver of claims by PBA against IAMG Holdings contained in the amendment cannot be sufficient consideration for IAMG's waiver of its claims against PBA.[7]

---

7. The Court is mindful that the March 20th Amendment states, in paragraph 1(a): "The parties warrant and agree that neither party is aware of any claims, one against the other, relating to the license at the time of the execution of this Agreement." However, that state-

■ Clearly, the PBA gave no consideration to IAMG Holdings in return for its waiver of all claims which predated the March 20th Amendment. The PBA argues that courts must assume that consideration is adequate without proof to the contrary. However, the PBA misconstrues the issue before this Court, which is failure of consideration, not adequacy of the consideration. Adequacy of consideration-the comparative value of the promises and acts exchanged-should be distinguished from the legal *sufficiency* of any particular consideration. As stated by the Supreme Court of Washington,

> '[A]dequacy' of consideration, into which courts seldom inquire, is to be distinguished from the legal 'sufficiency' of any particular consideration. The latter phrase is concerned not with comparative value but with that which will support a promise. Anything which fulfils the requirements of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised. The relative values of a promise and the consideration for it, do not affect the sufficiency of consideration.

*Browning v. Johnson,* 70 Wash.2d 145, 147, 422 P.2d 314, 316 (Wash.1967) (citations omitted). It is well established that an agreement to attempt to agree is not legally sufficient consideration. *Sandeman v. Sayres,* 50 Wash.2d 539, 314 P.2d 428 (Wash.1957). It is also well established that forbearance to assert an invalid claim by one who has neither honest nor reasonable belief in the validity of the claim or forbearance does not constitute consideration. *Huberdeau v. Desmarais,* 79 Wash.2d 432, 486 P.2d 1074 (Wash. 1971).

■ A failure of consideration supports the remedy of rescission of the contract. *Krause v. Mariotto,* 66 Wash.2d 919, 406 P.2d 16 (Wash.1965); *Wilkinson v. Sample,* 36 Wash.App. 266, 674 P.2d 187 (Wash.Ct.App.1983). The Plaintiffs have sought that remedy in their amended complaint. The PBA's assertion in its Reply to Debtors' Pre–Hearing Memorandum of Law that IAMG Holdings is estopped from arguing rescission has no basis in law or fact. Under Washington law, equitable estoppel requires (1) an admission, statement or act inconsistent with the claim afterward asserted; (2) action by the other party on the faith of such admission, statement or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission statement or act. *Leonard v. Washington Employers, Inc.,* 77 Wash.2d 271, 278, 461 P.2d 538, 543 (Wash.1969); *Kramarevcky v. Dept. of Social and Health Servs.,* 122 Wash.2d 738, 863 P.2d 535 (1993).

■ The PBA offered no evidence establishing that IAMG Holdings has acted inconsistent with its position that the waivers contained in the March 20th Amendment are invalid, as IAMG Hold-

---

ment is belied by the evidence. While the PBA acknowledged that it had no known claims against IAMG Holdings at the time of execution of the March 20th Amendment (Plaintiffs' Exh. 25), the PBA was aware that IAMG Holdings had numerous claims against the PBA at that juncture. Specifically, counsel testified about "substantial claims that we had interfered with their ability to perform, that we had granted others the right to sell products that they felt were exclusive to them

under their license, that we had improperly allowed people to download our logo and use it, [and] arguments over whether the patch ... was a product" covered by the License Agreement. (4/4/03 Tr., pp. 39–40). He also testified that he advised the PBA management to use the opportunity presented by IAMG Holdings' request for assistance in securing a loan from EMBC to obtain a release from all these claims. (4/4/03 Tr., p. 39–40).

ings has consistently asserted that the amendment is unenforceable as a matter of law. Further, the law is clear that mere silence is not enough to indicate an election to continue the contract, as the PBA asserts, in the absence of conduct inconsistent with a right to rescind. *Prager's Inc. v. Bullitt Co.*, 1 Wash.App. 575, 463 P.2d 217 (1969). Additionally, the PBA did not offer evidence of detrimental reliance by it on any action by IAMG Holdings, as required by Washington law.

■ Further, in order to create an estoppel, the party claiming to be influenced by the conduct or declaration of the other party must be destitute of knowledge of the true facts or without means of acquiring such facts. *Chemical Bank v. Washington Public Power Supply System*, 102 Wash.2d 874, 905, 691 P.2d 524, 542 (Wash. 1984), *cert. denied, Haberman v. Chemical Bank*, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985), *and cert. denied, Chemical Bank v. Public Utility District No. 1 of Benton County*, 471 U.S. 1075, 105 S.Ct. 2154, 85 L.Ed.2d 510 (1985). The PBA never addressed this issue during the hearing. Additionally, the PBA was always aware that it never consented to an assignment of the License to EMBC. That fact was well within the PBA's knowledge.

It is apparently the PBA's contention that its injury consists of IAMG Holdings' failure to fulfill its obligations to make all guaranteed minimum quarterly payments to the PBA in a timely manner, as required by the March 20th Amendment. In view of the fact that the PBA was always aware that it never consented to an assignment of the License to EMBC, or even adequately assisted IAMG Holdings in obtaining a loan by negotiating in good faith the terms upon which the PBA would consent to an assignment, as required by the March 20th Amendment, it cannot argue that it was unexpected that the Debtor did not timely make minimum quarterly payments. The failure of the Debtor to close the loan led directly to the Debtor's default.

The PBA also argues that IAMG Holdings is precluded from rescinding the March 20th Amendment because of an unreasonable delay in seeking rescission. Under the circumstances, the Court finds that the Plaintiffs have requested rescission within a reasonable period of time after discovery of the right to rescind.

### CONCLUSION

1. Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1334 and 157. Venue is proper in this district pursuant to 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The matter is before the Court pursuant to Fed.R.Civ.P. 56, as made applicable to bankruptcy case by Fed. R. Bankr.P. 7056.

3. The Court finds that there is no longer a genuine issue as to any material fact.

4. The Court finds that the March 20th Amendment fails for want of consideration, as the Plaintiffs received nothing in return for their waiver of claims, and, accordingly, the amendment is rescinded. Therefore, the Court denies the PBA's motion for summary judgment to dismiss (a) any claim asserted by the Plaintiffs which arose prior to March 20, 2001; (b) any claim related to the Debtors' failure to obtain financing from EMBC or any other lender due to the PBA's conduct; and (c) the Debtor's claim for rescission of the March 20th Amendment for failure of consideration. The Court also denies the PBA's request for partial summary judgment terminating the License Agreement because of the Plaintiffs' assertion of

claims which the PBA alleged were violative of the March 20th Amendment.

Counsel to Plaintiffs is directed to settle an order in accordance with this decision on five (5) days' notice to all parties having an interest herein.