IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37961-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MELISSA ANN SMITH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Melissa Ann Smith was convicted of vehicular homicide following a bench trial. She challenges the sufficiency of the evidence and two community custody conditions ordered by the court.

The charge arose from an early-evening accident in which the car Ms. Smith was driving left an interstate on-ramp and traveled almost 400 feet into a wooded area, striking and severing a tree before coming to rest. Ms. Smith had contact with two law enforcement officers and two emergency room physicians that night, all of whom believed she was intoxicated. No blood alcohol content (BAC) testing was ordered, however, because all were unaware that Ms. Smith had a passenger at the time of the accident who had been fatally injured. Ms. Smith's car, and the deceased passenger, were located the next morning.

At trial, the defense presented the expert testimony of a neuropsychologist who testified that Ms. Smith's symptoms and behavior following the accident were more likely the result of traumatic brain injury (TBI) than intoxication. Based on that evidence, and the absence of any eyewitness testimony other than Ms. Smith's, she argues on appeal that insufficient evidence supports the trial court's verdict that she was guilty of all three means of vehicular homicide. We disagree and find the evidence sufficient.

We affirm the conviction. The challenged community custody conditions require revision to comply with statutory changes, however, so we remand with directions to strike one and modify the other.

## FACTS AND PROCEDURAL BACKGROUND

Because Ms. Smith was convicted in a bench trial, we draw the facts from the trial court's findings of fact. Those to which Ms. Smith has assigned error are italicized. The unitalicized findings, not having been challenged, are verities on appeal. *DeSean v. Sanger*, __ Wn. App. 2d __, 516 P.3d 434, 438 (2022); RAP 10.3(g). Since the trial court found that the witnesses other than Ms. Smith were "highly credible," Clerk's Papers (CP) at 322, we treat the matters to which they testified, as found by the court, as established fact.

At approximately 6:30 p.m. on February 2, 2018, Washington State highway patrol troopers were alerted that a woman was walking on the shoulder of Interstate 90 (I-90) near an eastbound on-ramp adjacent to State Route 904. Trooper Ryan Senger located the woman, Melissa Ann Smith, at approximately 6:49 p.m. When he pulled up behind her in his fully marked police vehicle, she was stomping her feet and using most of the shoulder to walk. *Trooper Senger testified that the defendant was staggering all over.* She shielded her eyes from the light of his patrol car.

The trooper approached Ms. Smith and asked her how she was doing, and she responded that she was "tired and drunk." *Id.* at 347. She told him, "I walked because I knew I was drunk." *Id.* The trooper observed that she was slurring her words, her eyes were bloodshot and watery, and her eyelids were noticeably drooping. *There was a strong smell of alcohol emanating from her breath.* When Trooper Senger said he could take Ms. Smith to an exit where she could get a cab, she responded, "I will pay for a cab. Just don't fucking call the cops, please." *Id.* at 348.

Ms. Smith asked the trooper if he knew where her friend was. She said she was picking her friend up because her friend was having a fight with her boyfriend. She told the trooper, "I freaking wrecked my car; I remember that." *Id.*

After paramedics arrived, Ms. Smith provided numerous versions of events earlier that evening: that there was a man in her car who tried to stab her; a man in her car hit her

3

in the head; her friend Toshia Haveron was in the back seat of her car with her boyfriend and they were fighting; and that Ms. Smith had been chased. She stated that Ms. Haveron's boyfriend was a "psychopath" who took her car and "fucked me up." *Id.* Trooper Senger described her mood as vacillating between cooperative one moment and crying and emotional the next.

Based on his training, education as a drug recognition expert, and experience (Trooper Senger testified he had conducted approximately 400 driving under the influence arrests) the trooper believed Ms. Smith's behavior and presentation was consistent with alcohol intoxication. Had she been operating a motor vehicle, Trooper Senger testified he would have arrested her for driving while intoxicated. He did not request permission or pursue a warrant to determine Ms. Smith's BAC, however, because there was no evidence she might have committed a crime.

Paramedics transported Ms. Smith to the emergency room at Deaconess Hospital, where she was seen at around 8:00 p.m. by Peter W. Gottschalk, M.D. Ms. Smith told Dr. Gottschalk she had been "drinking with a friend while moving." *Id*. at 349. Her speech was slurred and she smelled strongly of alcohol.

Dr. Gottschalk testified that Ms. Smith had abrasions on her hand and head. He ordered a CAT (computer aided tomography) scan, which he testified was "'basically normal.'" *Id*. at 350. His diagnosis of Ms. Smith was "'loss of consciousness, head

4

injury, and belligerence.'" *Id. He testified that her behavior when he observed her on February 2, 2018, was consistent with an individual who is drunk.*

Dr. Gottschalk testified that he did not order any blood alcohol testing of Ms. Smith and it was not needed. Ms. Smith elected on her own to leave the hospital. Dr. Gottschalk testified that there was no "'legal basis'" to keep her at the hospital given her diagnosis, which was unremarkable. *Id.*

For reasons and under circumstances that are not clear, Ms. Smith arrived at the emergency room at Holy Family Hospital not long after leaving Deaconess Hospital. In response to a report that a woman had been assaulted by her friend's boyfriend, and her car stolen, Spokane County Deputy Sheriff Branden Carlos met with Ms. Smith in a waiting room at Holy Family Hospital at around 9:00 p.m. Ms. Smith told the deputy she was assaulted by her friend's boyfriend while driving, and her mother had called the police to report the assault. She told the deputy she had been helping her friend Toshia move when Toshia's boyfriend assaulted her. She told him the assault caused her to blackout and she could remember running on the freeway. Deputy Carlos noted that she had abrasions on her head, arm, and forearm. He also noted that she smelled of alcohol, her speech was slurred, and her eyes were red and glassy. Ms. Smith told him she had consumed "'several'" alcoholic beverages while helping her friend move. *Id.*

5

Dr. Mary Chiu, an emergency room physician at Holy Family Hospital, saw Ms. Smith at 9:44 p.m. on February 2. Dr. Chiu testified that Ms. Smith was distraught when she saw her. Dr. Chiu was aware the Ms. Smith had been to the Deaconess Hospital emergency room earlier, where she received a CAT scan that was normal. Dr. Chiu did not note any acute injuries to Ms. Smith. Her diagnosis of Ms. Smith was "'concussion and alcohol intoxication.'" *Id.* at 361. Dr. Chiu testified that Ms. Smith reported that she had been drinking earlier with her friend, but there was no way to know how much alcohol she had consumed.

Deputy Carlos testified that after speaking with Ms. Smith at Holy Family Hospital, he contacted Toshia Haveron's boyfriend, Steven Lewis Jr. Mr. Lewis told him that he had been staying with his sister, that he had never been in Melissa Smith's car, and that he did not know her. Deputy Carlos testified that following his conversation with Mr. Lewis, he spoke to Ms. Smith by phone and she admitted to him that Mr. Lewis had not, in fact, been in her car.

Mr. Lewis testified at the trial that on January 31, 2018, he and Ms. Haveron had quarreled, and he left their shared apartment to stay at his sister's. He testified that on February 3, 2018, he received an early morning call from Deputy Carlos who was looking for Ms. Haveron.

6

Mr. Lewis testified that he met with Deputy Carlos at Ms. Haveron's Cheney apartment around 2:00 a.m., and Ms. Haveron was not there. Deputy Carlos also testified to meeting Mr. Lewis at the apartment, and testified the men knocked on the door but there was no answer.

Mr. Lewis testified that after parting ways with Deputy Carlos, he began searching for Ms. Haveron, initially with his 16-year-old nephew and then on his own. When he spotted a white Dodge Durango that had crashed in a wooded area off the eastbound I-90 entrance lane near Four Lakes, he parked his car and walked down to check it out. The front driver's door was open when he reached the car, and Ms. Haveron was in the front passenger seat. He shook her but she did not respond; she appeared to be dead. He could smell alcohol coming from the vehicle's interior. Mr. Lewis called Ms. Haveron's mother, who told him to call police. Mr. Lewis's sister testified that when Mr. Lewis called her around 7:00 a.m. to tell her that Ms. Haveron was dead, he was hysterical. She drove to the scene to pick him up and took him back to her home.

A number of Washington State Patrol officers responded to the early morning report of the one-car accident with a fatality, and testified at the trial. Trooper Douglas Lux testified that on arriving at the scene, he noted the road conditions were clear and dry. He observed Ms. Haveron seated in the front passenger seat with the seat belt still attached and observed a bottle of "Rich and Rare" (R&R) Canadian whiskey on the front

passenger floorboard of the vehicle. *Id*. at 353. It was about half full. Trooper Lux determined that Melissa Smith was the registered owner of the Durango.

Detective Ryan Spangler of the Washington State Patrol was assigned as the primary detective in the case. He determined that the Dodge Durango was coming from Cheney on State Route 904 when the accident occurred. He testified that the on-ramp where the accident occurred was not a "'typical'" or "'common'" on-ramp. *Id*. at 356.

Using a measuring device, Detective Spangler determined that the Durango traveled 225 feet after leaving the roadway before striking a tree. It traveled a total distance of 385 feet after leaving the roadway before reaching its final resting point. The roadway on which the Durango was traveling before leaving the roadway had a posted speed limit of 40 m.p.h. Detective Spangler testified that based on his training and experience, he believed that the Durango was traveling at 50 m.p.h. or more when it left the roadway, and at least 50 m.p.h. when it struck the first of two trees. Detective Spangler testified that the primary damage sustained by the Durango's passenger side was caused by the Durango striking a tree prior to arriving at the vehicle's final resting point.

Trooper Troy Corkins had researched the weather at the time of the accident, and testified that it had been approximately 40 degrees and foggy. He testified that the first

of the two trees struck by the Durango remained standing while a second, small adjacent tree was uprooted.

After arriving at the accident scene, Trooper Matthew Weberling set about looking for Ms. Smith. He found her at her mother's house in Spokane shortly before 11:00 a.m. She was cooperative. He described her demeanor as highly emotional and that she was crying and concerned about what was going to happen to her.

Spokane County Medical Examiner Sally Aiken testified to performing an autopsy on Ms. Haveron. She testified that Ms. Haveron had abrasions and bruises on her body and a number of broken ribs: five on her left side and two on her right. She testified that Ms. Haveron's fatal injury, caused by the motor vehicle accident, was a massive left hemothorax due to blunt impact to the left lung. A toxicology lab report admitted into evidence showed Ms. Haveron's blood alcohol level had been .21.

The defense called an expert witness, neuropsychologist Brian Campbell, PhD. Dr. Campbell testified that based on his review of the medical records, Ms. Smith suffered TBI as a result of the February 2 accident. He testified that TBI is suggested because there was clear evidence of frontal impact to Ms. Smith's head and more probably than not, she suffered a concussion. He testified that a CAT scan cannot rule out TBI. He testified that symptoms of TBI can include headache, nausea, vomiting, loss of consciousness, fatigue, low energy, confusion, psychosis, and belligerence, and that

there can be overlap between symptoms of TBI and intoxication.  He testified he was aware Ms. Smith had been drinking on February 2, 2018, and acknowledged that the hospital patient notes he reviewed stated Ms. Smith had been drinking heavily.  He testified that TBI would not make an individual smell like alcohol, and a person can suffer TBI while intoxicated.

Ms. Smith testified that approximately a week before the February 2 accident, Ms. Haveron, one of her best friends, requested help moving out of her Cheney apartment. Ms. Smith offered to let Ms. Haveron live at her home, and Ms. Haveron agreed.  In moving Ms. Haveron out of her Cheney apartment on February 2, they first moved a bed and TV to Spokane, and then returned to Cheney.  Ms. Smith testified that Ms. Haveron had been drinking beer earlier, and on the return trip to Cheney, they stopped at a store and Ms. Haveron bought R&R Canadian whiskey.  Ms. Smith testified that she herself did not consume any alcohol before the first trip to Spokane and had only a "'sip'" of the R&R from the bottle on arriving at the Cheney apartment.  *Id*. at 370.  She testified that she drank from the bottle only one more time, and it would have been around 2:30 p.m. at the latest.  *She testified that she and Ms. Haveron left the apartment after 5:20 p.m. to return to Spokane in the Durango.*  She testified that Ms. Haveron took the bottle of R&R whiskey for the drive to Spokane and it was in Ms. Haveron's lap while in the Durango.

Ms. Smith testified that the conditions were "'foggy and dark'" for the drive to Spokane. *Id.* at 371. She testified that at the entrance to the I-90 on-ramp, something hit her in the back of the head, causing her to twist around to see what it was. She testified that her next memory was being at her mother's house and talking to a police officer. She testified the tires on her Durango were "'bad'" at the time of the accident. *Id.*

Trooper Lux was called by the State as a rebuttal witness. He testified that he and others had examined the tires on Ms. Smith's Durango, and *they were not unsafe to drive, and his measurements determined that they were within safe operating limits.*

The trial court took the case under advisement and issued written findings and conclusions several weeks later. It found Ms. Smith guilty of all three means of vehicular homicide provided by RCW 46.61.520. It sentenced her to 110 months of confinement, followed by 18 months of community custody. As part of her community custody sentence, Ms. Smith was ordered to "pay supervision fees as determined by DOC [the Department of Corrections]" and "undergo an evaluation for treatment for . . . substance use disorder." *Id.* at 442-43. She appeals.

ANALYSIS

Ms. Smith challenges the sufficiency of the evidence to sustain the trial court's verdict finding her guilty of vehicular homicide. She assigns error to 5 of the court's findings of fact, 15 of its conclusions of law, and 3 of its special verdict answers. She

11

also assigns error to 2 community custody conditions. We address her assigned errors in the order stated.

I.      THE EVIDENCE IS SUFFICIENT TO SUPPORT THE TRIAL COURT'S GUILTY VERDICT

      A.      Substantial evidence supports the trial court's findings of fact, including findings of fact that it labels conclusions of law

Ms. Smith argues that substantial evidence does not support all or part of the trial court's findings of fact, some of which she submits are mislabeled as conclusions of law. The State agrees that some of the trial court's factual findings are mislabeled as legal conclusions, and it defends all of them against Ms. Smith's challenges.

"If a determination concerns whether evidence shows that something occurred or existed, it is properly labeled a finding of fact," but "if the determination is made by a process of legal reasoning from facts in evidence, it is a conclusion of law." *State v. Niedergang*, 43 Wn. App. 656, 658-59, 719 P.2d 576 (1986). When a finding of fact is mislabeled a conclusion of law (or vice versa), we analyze it as what it actually is, ignoring the trial court's label. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

We agree with the parties that some of what the trial court labels as conclusions of law are, in whole or in part, findings of fact. We review them as such. We accept the State's identification of the mislabeled conclusions of law as conclusions 5, 32, 57, 58, 60, 62, 64, and 70.

12

Following a bench trial, appellate review is limited to determining whether substantial evidence supports the trial court's findings of fact and, if so, whether the findings support its conclusions of law. *Young v. Toyota Motor Sales, U.S.A.*, 9 Wn. App. 2d 26, 32, 442 P.3d 5 (2019) (citing *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). "'Substantial evidence'" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *Id.* Circumstantial evidence is considered just as reliable as direct evidence and may be used to establish the elements of a crime. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). The substantial evidence standard is deferential, and requires us to view the evidence and reasonable inferences in the light most favorable to the party who prevailed below. *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1, 14, 436 P.3d 857 (2019) (citing *Mansour v. King County*, 131 Wn. App. 255, 262-63, 128 P.3d 1241 (2006)). We defer to the trial court on the persuasiveness of the evidence, witness credibility, and conflicting testimony. *DeSean*, 516 P.3d at 438. Deviations on minor matters not relevant to the issues before this court are harmless and not reversible. *Prager's, Inc. v. Bullitt Co.*, 1 Wn. App. 575, 577, 463 P.2d 217 (1969) (citing *McLeod v. Keith*, 69 Wn.2d 201, 417 P.2d 861 (1966)).

Where Ms. Smith has assigned error to only a portion of a finding or conclusion, we set forth the portion identified in her assignments of error, which appear at pages two through five of her amended opening brief.

13

> *Finding of Fact 5: . . . There was a strong smell of alcohol emanating from her breath.*
>
> *Conclusion of Law 5: . . . there was a strong smell of alcohol on her breath.*
>
> *Conclusion of Law 62: . . . Trooper Senger also noted there was a strong odor of alcohol emanating from the Defendant's breath.*

Ms. Smith challenges findings that there was a strong smell of alcohol on or emanating from "her breath" because, she argues, no witness spoke of the smell being on or from her breath—she points out that Trooper Senger testified to detecting an odor of alcohol coming from "her *person*." Report of Proceedings (RP) at 119 (emphasis added). In fact, however, Deputy Carlos testified that he "was able to smell an alcoholic beverage in her breath—on her breath, and her eyes were red and glossy." RP at 34.

In addition, immediately after Trooper Senger testified that he detected an odor of alcohol coming from Ms. Smith's person, he testified that from his observations, he formed the opinion that she was intoxicated. Likewise, Dr. Gottschalk testified that Ms. Smith "smelled strongly of alcohol," which he found consistent with her statement that she had been drinking heavily that afternoon. RP at 138. When a witness associates the smell of alcohol with their belief that an individual is intoxicated, the most reasonable inference is that they perceive the odor as consumption-related, from the individual's breath. Because we view this reasonable inference in the light most favorable to the State, which prevailed below, substantial evidence supports the findings.

*Finding of Fact 12: . . . Trooper Senger testified that the Defendant was staggering all over . . . .*

Ms. Smith argues that this portion of finding 12 is not supported by substantial evidence because Trooper Senger merely testified he saw Ms. Smith "staggering," not that he saw Ms. Smith "staggering all over." RP at 114. In addition to characterizing Ms. Smith as staggering, however, Trooper Senger testified to the following observations of the manner in which she was moving: she was "stomping her feet and walking very heavily," suggesting to the trooper that she was "unsteady on [her] feet and . . . unable to hold [herself] up and walk"; she was "walking in a manner that was using most of the shoulder"; she was "walking left and right as she was taking her steps and leaning, swaying as she was walking"; and "[i]t appeared that she was unsteady on her feet and balance." RP at 113-14. A fair-minded person would view "staggering all over" as a reasonable shorthand for these observations.

*Finding of Fact 27: Dr. Gottschalk testified that . . . the Defendant's behavior when he observed her on February 2, 2018 was consistent with an individual who is drunk.*

Ms. Smith argues this is not supported by substantial evidence because Dr. Gottschalk never used the word "drunk" in his testimony. He did testify, however, that Ms. Smith seemed to be indicating that "she was drinking heavily," he observed that she "smelled strongly of alcohol," her behavior was consistent with being "intoxicated," and

15

his diagnosis of her condition included "alcohol abuse." RP at 137-41. A fair-minded

person would view "drunk" as a reasonable characterization.

> *Finding of Fact 213: The Defendant testified that she and Ms. Haveron left the apartment after 5:20 p.m. to return to Spokane in the Durango.*

Ms. Smith argues that this finding is not supported by substantial evidence

because when she was asked about when she and Ms. Haveron left to go back to

Spokane, she testified, "It was after 5:00 . . . [p]robably like 5:20 [p.m]." RP at 472.

This trial court error could not be less consequential. It is harmless.

> *Finding of Fact 227: Trooper Lux testified that the tires on the Durango were not unsafe to drive and that his measurements determined that the tires were within safe operating limits.*

After Ms. Smith testified that the tires on her Durango were "mud tires" that

"weren't meant to be on the wet road," RP at 484, Trooper Lux testified in rebuttal that

he and Detective Spangler checked the tires on the Durango the morning he arrived at the

accident scene:

> Q    Were the tires in good shape, based on your examination?
>
> A    Yes. The tread depth, all of them, were 7 or 8/32 tread depth on all of them. The tire pressure was anywhere between 28 and 33 PSI, and then the left front tire was flat.
>
> Q    Now, that flat left tire, subsequently did you or any members of your team participate in a check of that tire to see if that tire was in good shape?
>
> A    I was just informed by Detective Spangler that the tire was checked.
>
> [DEFENSE COUNSEL]: Objection, Your Honor. That's clearly hearsay.

> [PROSECUTOR]:  Your Honor, the State would ask—this is an investigative part of the team, and he was one of the experts that responded that day to do the analysis.  He should be able to testify about what was contained in those reports.
>
> THE COURT:  He's part of the team.  I'll allow it.
>
> But before he answers, I'm sorry, trooper, I lost—I couldn't keep up: Which tire was flat?
>
> THE WITNESS:  I believe the left front.
>
> THE COURT:  Okay.  Thank you.
>
> BY [THE PROSECUTOR]:
>
> Q     Was that tire subsequently checked, and did it hold pressure?
>
> A     Yes.  That's what I was told by Detective Spangler.
>
> Q     Were you and your team able to rule that out as a cause of the accident?
>
> A     Yes.
>
> . . . .
>
> Q     What kind of tires were they?  Were they mud tires?
>
> A     They were Suretrac all terrain tires.

RP at 491-92.  Cross-examination was invited, but defense counsel had no questions.

Ms. Smith argues that the trial court's finding is not supported by the evidence because Trooper Lux did not testify that the tires "were not unsafe to drive" or that his measurements determined they were "within safe operating limits."  Am. Appellant's Opening Br. at 52-53.  A fair-minded person could infer those conclusions from Trooper Lux's confirmation, twice, that the tires were in "good shape"; his testimony that when

checked, the flat tire held pressure; that they were all terrain tires; and that they were

ruled out as a cause of the accident.

> *Conclusion of Law 32: Law enforcement reported that road conditions adjacent to the crash site were "normal" and that there was no reason environmentally . . . that could be determined as a factor which may have caused the Durango to crash.*
>
> *Conclusion of Law 58: There is no evidence to suggest that weather on February 2, 2018, or other environmental factors may have contributed towards the Durango crashing.*

Ms. Smith argues that these mislabeled factual findings were not supported by

substantial evidence first, because no witness testified that the conditions were "normal,"

and second, because Ms. Smith testified it was "dark and foggy" that evening.

Trooper Lux testified that when he arrived at the scene of the accident the early

morning of February 3, it "was bare and dry, approximately 40 degrees." RP at 199.

Many photographs taken the morning of February 3 were admitted in evidence and

confirm that the ground was free of snow and ice, and dry. The video and photographic

evidence is consistent with Detective Corkins's research indicating that at the time of the

accident, the weather was "in the 40s and foggy." RP at 255.

Ms. Smith was asked about the conditions preceding the accident and testified

only that it was "really foggy" and later "dark" and "foggy." RP at 474, 484. For it to

have been dark at 5:20 p.m. in early February would be normal. Exhibit P-50, the

videotape from Trooper Senger's dash cam taken shortly before 7:00 p.m., reveals

conditions that were not particularly foggy; the visibility was quite good. Light fog in early February would not be abnormal. It was for the trial court to assess the conflict between the dash cam video and Ms. Smith's testimony that it was "really foggy." We defer to its assessment.

Given this evidence, and the absence of evidence that an environmental condition contributed to the accident, substantial evidence supports the findings.

> *Conclusion of Law 57: There is substantial direct and circumstantial evidence that when the Defendant's Dodge Durango exited the paved roadway and traveled into the wooded gully, the vehicle's speed was far in excess of the posted 40 m.p.h. speed limit.*
>
> *Conclusion of Law 71: Law enforcement testing suggests that the Defendant was far exceeding the posted speed limit of 40 m.p.h. when she crashed.*

Ms. Smith argues that these factual findings are not supported by substantial evidence because the speed of 50 m.p.h. or more at which Detective Spangler opined the Durango left the roadway and 50 m.p.h. speed at which it traveled thereafter is only 10 m.p.h. over the posted speed limit—an excess she argues is not "far in excess." Am. Appellant's Opening Br. at 54. We disagree. "Far in excess" conveys a normative judgment. For the trial judge, "far in excess" could reasonably mean materially more than the creep up in speed that can happen to even a driver who is trying to maintain the posted speed. Ten m.p.h. in a 40-m.p.h. zone, at night, in light fog, is well more creep up than would happen to a driver trying to maintain the posted speed.

19

> *Conclusion of Law 64: Additional evidence of the Defendant's intoxication contained in Dr. Gottschalk's notes included her statement that she had been drinking heavily with one of her friends she was helping to move . . . .*

Ms. Smith argues that Dr. Gottschalk's testimony that Ms. Smith "seemed to be indicating that she was drinking heavily," is not the same as testifying that Ms. Smith *had* been drinking heavily. Am. Appellant's Opening Br. at 43. She argues that on cross-examination, when defense counsel asked if it was possible that what Ms. Smith was trying to express was that *her friend* was drinking heavily—not that Ms. Smith was—Dr. Gottschalk answered, "That's possible." RP at 147. From this, Ms. Smith argues that substantial evidence does not support Dr. Gottschalk's testimony about what he understood.

When a percipient witness testifies to what they *perceived* a person to be saying, but admits the person was "possibly" trying to say something else, a trier of fact can reasonably attach more weight to the witness's perception than to what "is possible." A trier of fact might be particularly inclined to attach weight to the witness's perception if the percipient witness is a careful listener for an important purpose, such as an emergency physician listening to a patient. Substantial evidence supports this finding.

> *Conclusion of Law 70: . . . Further, she admitted to several law enforcement officers and emergency room physicians that she was "drunk and tired," that she was "too drunk to drive" . . . .*

20

Ms. Smith challenges this excerpt from conclusion of law 70.  The complete portion of the conclusion states that Ms. Smith admitted to several law enforcement officers and emergency room physicians "that she was 'drunk and tired,' that she was 'too drunk to drive,' and that she had been drinking while helping her friend Toshia Haveron move."  CP at 321.

Ms. Smith challenges conclusion 70 as if it is a finding that she made *all three* admissions to *each* of several law enforcement officers and emergency room physicians. She argues that the only person to whom she made all three admissions was Trooper Senger.

We disagree with her reading of the finding.  Reasonably read, the finding states that she made one or more of the three admissions to several law enforcement officers and emergency room physicians.  As demonstrated by the unchallenged findings in our factual recount above, the evidence established that she did make one or more of the three admissions to Trooper Senger, Trooper Weberling, Deputy Carlos, Dr. Gottschalk, and Dr. Chiu.

B.      The trial court's conclusions of law are supported by its findings of fact

*Conclusion of Law 74:  Numerous law enforcement officers, physicians, professionals, and lay citizens testified in this trial, and all were, in the opinion of this court, highly credible.*

*Conclusion of Law 75:  However, the testimony of the Defendant Melissa Ann Smith was not credible and contained multiple conflicting, contradictory, self-*

21

*serving and, in some instances, completely nonsensical explanations of the events
that transpired on February 2 and 3, 2018.*

Ms. Smith provides no argument in support of her assignment of error to

conclusions of law 74 and 75. It is the trial court's role to assess credibility, and helpful

to appellate review for the trial court to disclose its credibility assessments.

Our analysis of Ms. Smith's challenge to the trial court's remaining conclusions of

law (enumerated 1, 2, and 3)[1] is the same as our analysis of its special verdicts, which we

turn to next.

C.     The trial court's answers on its special verdict form are supported by its
       findings of fact

*Answers of "yes" to the following questions in the court's special verdict
form:*

*1) At the time of causing the injury to Ms. Haveron, was the Defendant
operating a motor vehicle while under the influence of intoxicating liquor
or drugs?*

---

[1] The conclusions state that the court finds beyond a reasonable doubt that

1. MELISSA ANN SMITH committed the crime of VEHICULAR
HOMICIDE as charged in the Amended Information dated August 29,
2019, on or about February 2, 2018, and did thereby cause injury to Toshia
Haveron, who died within three years on or about February 2, 2018 as a
proximate result of said injury.

2. The Court finds MELISSA ANN SMITH guilty of the crime of
Vehicular Homicide on or about February 2, 2018

3. These acts were committed and occurred within the State of Washington.

CP at 322.

> *2) At the time of causing the injury to Ms. Haveron, was the Defendant operating a motor vehicle in a reckless manner?*
>
> *3) At the time of causing the injury to Ms. Haveron, was the Defendant operating a motor vehicle with disregard for the safety of others?*

Am. Appellant's Opening Br. at 5-6 (emphasis added).

RCW 46.61.520(1) provides:

> When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
>
> (a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502; or
>
> (b) In a reckless manner; or
>
> (c) With disregard for the safety of others.

RCW 46.61.502(1) provides a "per se" standard for being under the influence of alcohol based on timely breath or blood testing. But it also provides a non-per se standard, where "the person is under the influence of or affected by intoxicating liquor." RCW 46.61.502(1)(c). A non-per se violation can be based on a variety of evidence, such as field sobriety tests, other scientific tests, observation, and smell. *State v. Donahue*, 105 Wn. App. 67, 74, 18 P.3d 608 (2001). Observation of intoxication is an example of an opinion that can be expressed even by a lay witness. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). A lay witness does not need an individual's BAC to discern that the individual is stumbling, smells of alcohol, and therefore is intoxicated. *City of Seattle v. Levesque*, 12 Wn. App. 2d 687, 706, 460 P.3d 205 (2020).

23

Operating a vehicle "in a reckless manner" means driving in a "'rash or heedless manner, indifferent to the consequences.'" *State v. Roggenkamp*, 153 Wn.2d 614, 631, 106 P.3d 196 (2005). "[D]isregard for the safety of others" means "an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term 'negligence.'" *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967).

The trial court's findings of fact support its conclusion beyond a reasonable doubt that Ms. Smith was guilty of all three means of vehicular homicide. Ample evidence supports the conclusion that she was under the influence of alcohol at the time of the accident. She told law enforcement and emergency treatment providers on the night of the accident that she was drunk and had been drinking heavily—not, as she would later testify at trial, that she had taken only two "sips" sometime before 2:30 p.m. RP at 283. The trial court found Ms. Smith's trial testimony not credible. Ms. Haveron's .21 BAC was some evidence, albeit circumstantial, of the women's drinking that afternoon. All four law enforcement and emergency treatment providers observed signs that Ms. Smith was intoxicated and believed she was intoxicated. Her movements and demeanor captured by Trooper Senger's dash cam video is real time evidence consistent with intoxication.

Dr. Campbell testified that what he read in the medical records was, in his opinion, more consistent with TBI, but there was no test that could back up his opinion. He conceded that even if Ms. Smith suffered TBI, she could have been intoxicated, too.

Given the conditions and Ms. Smith's actions, Detective Spangler's testimony that Ms. Smith was traveling at 50 m.p.h. or more at the time her Durango left the roadway and continued traveling at 50 m.p.h. thereafter, supports the conclusion that she was operating her vehicle recklessly and with disregard for the safety of others. Although no one but Ms. Smith characterized the conditions as "very foggy" (and the dash cam video conflicts with that characterization), it is undisputed that it was somewhat foggy and dark, yet Ms. Smith drove on a roadway unfamiliar to her at a speed 10 m.p.h. or more than the posted speed limit. And rather than slow down and pull over to investigate the object that she claims struck her from behind, she turned with her full body to look behind her while continuing to travel at high speed. The trial court could find guilt beyond a reasonable doubt on this evidence.

II.    COMMUNITY CUSTODY CONDITIONS

The first community custody condition to which Ms. Smith assigns error is the boilerplate language in section 4.2(B) of her judgment and sentence that she "pay supervision fees as determined by DOC." CP at 442. Like many indigent defendants

appealing in recent years, Ms. Smith contends that the trial court's failure to strike the requirement for payment was inadvertent.

Effective July 1 of this year, the legislature amended former RCW 9.94A.703(2)(d) (2018) to eliminate the formerly waivable supervision fees. In *State v. Wemhoff*, __ Wn. App. 2d __, 519 P.3d 297, 298-99 (2022), this court recently held that the amendment applies to cases pending on direct review. On remand, the trial court should strike the provision requiring payment of supervision fees from the judgment and sentence.

Ms. Smith also challenges the requirement at section 4.2(B) of her judgment and sentence that she "undergo an evaluation for treatment for . . . substance use disorder . . . and fully comply with all recommended treatment." CP at 443. The State points out that the requirement for a "substance use evaluation" would be proper under the current version of RCW 9.94A.703(4), which became effective July 2022. Given the date of her crime, however, the State concedes that under the prior version of RCW 9.94A.703, the diagnostic evaluation of the offender was required to be completed by an "alcohol or drug dependency agency," and to be crime related. Former RCW 9.94A.703(3), (4) (2009). *See* RCW 9.94A.345 (providing that sentences imposed under the Sentencing Reform Act of 1981, chapter 9.94A RCW, shall be determined in accordance with the law in effect when the current offense was committed).

No. 37961-2-III
*State v. Smith*

We affirm the conviction. We remand with directions to strike the requirement to pay supervisory fees to DOC and to substitute a requirement for an alcohol use, rather than substance use, evaluation.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

27